**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **ROBIN MAYFIELD, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION 3:17-CV-514-CWR-FKB** |
| **v.** | ) | |
| | ) | |
| **BUTLER SNOW LLP, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFFS' RESPONSE TO RICHARD WILBOURN III'S MOTION TO DISMISS

COME NOW Plaintiffs Robin Mayfield, Owen Mayfield, William Mayfield, and the Estate of Mark Stevens Mayfield (collectively, the "Plaintiffs" or "Mayfields"), by and through counsel, and respectfully submit this Response to the Motion to Dismiss [ECF Doc. 35] (hereinafter the "Motion to Dismiss" or "Motion") filed by Defendant Richard Wilbourn, III (hereinafter "Wilbourn"), and state as follows:

## INTRODUCTION

Plaintiffs' Amended Complaint[1] alleges that Wilbourn conspired with the government actors who intentionally violated the Constitutional rights of Mark Mayfield ("Mark"). Wilbourn was a participant in that conspiracy. Yet, before becoming an ally and co-conspirator of the government actors, he had actively participated in the underlying activity of the Rose Cochran Incident that that led to the arrest of Mark Mayfield[2]. After Clayton Kelly ("Kelly") published the anti-Cochran video that included a still photograph of Rose Cochran, Wilbourn (who had always

---

[1] References to the Amended Complaint [ECF Doc. 6] hereafter are abbreviated as "Compl."

[2] For instance, he told Mark to contact John Mary about exposing Thad Cochran's affair with Kay Weber (Compl. ¶ 78). He was actively involved in discussions with John Mary and Clayton Kelly about how Kelly could get into St. Catherine's Village (Compl. ¶ 86). He emailed Mark about Cochran having an affair and about Rose Cochran's room number. (Compl. ¶ 89).

been secretive, for instance, only calling Kelly from a blocked number (Compl. ¶¶ 84, 86)), became even more suspicious. Then, although the State Actor authorities had information identifying Wilbourn as the person who called Clayton Kelly on March 28, 2014, and gave Kelly instructions and directions on getting into St. Catherine's Village, they never arrested or charged Wilbourn as they did others for the same activity. Rather, Wilbourn was listed as a witness for the prosecution in Clayton Kelly's trial. (Compl. ¶ 102). It is in the very nature of conspiracies to commit wrongs to be secretive; therefore, they may have to be proved by circumstantial evidence for a jury to weigh. The Amended Complaint herein alleges sufficient facts for a jury to infer that Wilbourn conspired and colluded with the State Actors to violate Mark Mayfield's Constitutional rights.

Further, Plaintiffs' Amended Complaint alleges that Wilbourn's wrongful conduct proximately caused Mark Mayfield's death. In addition, it alleges that Wilbourn's conduct was such that if Mark's death was properly ruled a suicide, the suicide did not constitute an intervening cause of death because Wilbourn's conduct was a proximate cause of an irresistible impulse in Mark that resulted in self-destructive acts. Mark eventually realized that his supposed "friend" was setting him up to go to jail while extricating himself from the Rose Cochran Incident; coupled with the professional, economic, and emotional toll being exacted upon Mark (all of which also resulted from the conspiracy of which Wilbourn was a part), a reasonable trier of fact could determine that Mark's mental state was compromised as the result of Wilbourn's actions. Plaintiffs are not required to prove that Wilbourn intended for Mark to die; they only need to have alleged facts sufficient to support an inference that Wilbourn's conduct contributed to a distressed and diminished mental state that resulted in an irresistible impulse in Mark to cause self-harm.

As alleged in the Amended Complaint, Mark's death was ruled a suicide (by the investigative authorities). Plaintiffs do not concede that this ruling of death by suicide was correct. Rather, for purposes of the instant Motion to Dismiss, Plaintiffs address Wilbourn's contention

that the suicide exception to wrongful death causes of action applies in order that he may escape liability for Mark's death. Discovery may provide additional facts in addition to those already known by Plaintiffs that could suggest that a finding of suicide was incorrect.

Additionally, Plaintiffs' Amended Complaint alleges negligent infliction of emotional distress on behalf of all the Plaintiffs—Mark's Estate, Robin, Owen, and William. Wilbourn's conduct was the foreseeable cause of the Mayfields' injuries from emotional distress. Moreover, for Robin, Owen, and William, the emotional distress caused includes the emotional distress they have suffered as the result of their late husband and father's death, which accrued at the time they discovered his death (at the earliest). Their claims are timely.

Finally, there is no reason that Plaintiffs should be "judicially estopped" from asserting claims against Wilbourn. The Plaintiffs have not previously taken a position that is contrary to the one they take herein with respect to Wilbourn (or, for that matter, any of the Defendants), nor has a court previously accepted the alleged prior inconsistent position. In fact, the Madison County Chancery Court found that the Plaintiffs could properly file a complaint for relief (as they now have) against Wilbourn. For the reasons previously stated in Plaintiffs' Motion to Strike [ECF Doc.45], which is adopted and incorporated herein by reference, the Court should not consider the evidence offered by Wilbourn in support of his judicial estoppel argument. Even if considered, however, judicial estoppel does not apply or preclude the instant claims against Wilbourn. For all these reasons, Wilbourn's Motion to Dismiss should be denied.

## <u>ARGUMENT</u>

### I.      The Well-Pleaded Complaint Rule provides the standard of review.

"A pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2), Federal Rules of Civil Procedure. "Detailed factual allegations are not required, but a pleading that offers 'labels and conclusions'

or 'a formulaic recitation of the elements of a cause of action will not do.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When considering a motion to dismiss under Rule 12(b)(6), the trial court is to accept all well-pleaded facts as true, view those facts in the light most favorable to the plaintiff, and draw all reasonable inferences in favor of the plaintiff. *Balle v. Nueces County*, No. 16-40789 (5th Cir., June 15, 2017); *Ibe v. Jones*, 836 F.3d 516, 524 (5th Cir. 2016); *Toy v. Holder*, 714 F.3d 881, 883 (5th Cir. 2013). "Well-pleaded factual allegations may perfectly shield a complaint from dismissal under Rule 12(b)(6), and [the Fifth Circuit] inquiry's 'emphasis on the plausibility of a complaint's allegations does not give district courts license to look behind those allegations and independently assess the likelihood that the plaintiff will be able to prove them at trial.' " *Breton Energy, L.L.C. v. Mariner Energy Res., Inc.*, 764 F.3d 394 (5th Cir. 2014)(quoting *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 803 n.44 (5th Cir. 2011).

## II.   The Amended Complaint satisfies the Well-Pleaded Complaint Rule.

### A.   Section 1983 violation and conspiracy

In responses to motions to dismiss filed by Butler Snow and Don Clark [ECF Doc. 27, 28] and Gene Waldrop, Vicki Currie and Chuck Harrison [ECF Doc. 31, 32], the Plaintiffs have demonstrated that the Amended Complaint pleads sufficient factual allegations to support their claim that these defendants conspired to and did violate Mark's Constitutional rights. Those prior responses provide pertinent background and foundation to the Plaintiffs' response to Wilbourn's

Motion, because the Amended Complaint alleges that Wilbourn participated in that conspiracy. Rather than repeating the points and authorities in those prior responses, they are incorporated here by this reference. Specifically as to Wilbourn, the following excerpts from the Amended Complaint further demonstrate that it states a claim plausible on its face against Wilbourn in the context of the allegations against the other Defendants:

¶ 16. Defendant Richard Wilbourn, III, is an adult resident of Madison County, Mississippi. Mr. Wilbourn may be served with process at 206 Jefferson Ridge, Ridgeland, Mississippi 39157.

¶ 78. On information and belief, Wilbourn told John Mary that he should contact Mark Mayfield. John Mary contacted Mark via Facebook message and the two began discussing politics. Ultimately, the topic of getting a photograph of Rose Cochran was discussed. Mary said he knew that Mrs. Cochran lived in the same facility as Mark's mother, but Mark was unwilling to take a photograph.

¶ 79. On information and belief, Wilbourn asked for Mark's help in learning where Mrs. Cochran's room was located.

¶ 80. After Mark's mother passed away on March 16, 2014, Wilbourn capitalized on the opportunity, asking Mark to meet him at St. Catherine's Village when Mark went to clean out his mother's room.

¶ 81. On information and belief, Mark and Wilbourn were at St. Catherine's Village on a Sunday afternoon in late March or early April 2014, and Mark pointed Wilbourn down the hall on the second floor to where Rose Cochran's room was located. (n. 2  Despite Plaintiffs' best efforts to obtain them, the St. Catherine's videos from this date have gone missing.)

¶ 82. Mark, having done all he agreed to (show where the room was), said he would do nothing further; Wilbourn assured Mark he would take everything from there.

¶ 83. John Mary or Wilbourn told Mark that he knew of a guy (later discovered to be Clayton Kelly) who would take photographs of Mrs. Cochran in her bed.

¶ 84. On or about March 27, John Mary told Clayton Kelly that he should be getting a call with information about Rose Cochran. Kelly contacted Mary to tell him he was receiving calls from a blocked number and that the caller, who was not Mark, left a voicemail claiming to have information on Mrs. Cochran. Kelly, however, said he was expecting a call from Mark and would not answer the blocked number.

¶ 85. Mary let Kelly know that he did not know who the caller with information was, but instructed Kelly to answer all calls, including those from blocked numbers.

¶ 86. Using a blocked phone number, Wilbourn gave the information on the layout of the nursing home to Clayton Kelly.

¶ 89. On May 14, 2014, Wilbourn sent Mark an email message referencing Senator Cochran having a mistress and referring to Rose Cochran's room number at St. Catherine's Village.

¶ 96. The same day that Kelly was arrested, Wilbourn and Mark had planned to do some campaigning for McDaniel during skull races at the Ross Barnett Reservoir.

¶ 97. After they finished, Mark got a call from Wilbourn. Wilbourn said Mark had left something at his house and needed to come pick it up.

¶ 98. Once there, Wilbourn told Mark that they could no longer have contact with each other and cut ties. Seeing arrests being made and the players start to be revealed, Wilbourn clearly wanted to avoid any implication in the Rose Cochran Incident and started hiding his tracks.

¶ 101. Having abandoned Mark in his time of need, after Mark's arrest, Wilbourn left a handwritten note on the Mayfields' front door saying he was sorry this had happened. Mark kept the note for a while, but weeks later, asked Robin to shred it.

¶ 102. Richard Wilbourn was listed as a potential witness for the prosecution in Clayton Kelly's trial. When the Clarion-Ledger newspaper attempted to speak to him for a story it ran on June 4, 2015, he could not be reached for comment. Nor has he ever made one.

¶ 103. Nonetheless, both at Kelly's arraignment and when he pled guilty and received his sentence, Wilbourn was observed in the courtroom.

¶ 104. Despite their knowledge of Wilbourn and his involvement in spearheading the attempts to obtain Rose Cochran photographs, on June 18, 2015, the Madison County District Attorney's Office made published statements to the Clarion-Ledger that there were no other persons involved.

¶ 105. The Clarion-Ledger was told by the Madison County District Attorney's Office that prosecutors were confident they prosecuted all conspirators in the Cochran nursing home photo case "based on all available evidence."

¶ 106. Instead of identifying Richard Wilbourn as the person who instructed Kelly on where Rose Cochran's room was and how to get into the facility, authorities expressly said it was Mayfield. These were false and reckless statements.

¶ 107. Instead, an Assistant District Attorney went even further and told the press, "We have no evidence that Mark Mayfield came into St. Catherine's with anyone else from the time of his mother's death until the video was taken on April 20th (2014). We have thoroughly been through all the surveillance videos." Quite simply, both statements are untrue.

¶ 211. Despite the investigation, and despite his involvement in scouting and mapping St. Catherine's Village and conveying the information on location and access to Kelly, Richard Wilbourn was never arrested or charged with any crime.

¶ 242. In short, those who were deemed the most easily expendable—by the Cochran Campaign and those acting on its behalf, its State Actor Defendant supporters, and Richard Wilbourn—took the fall; Wilbourn was able to use his money and connections to avoid being charged. Investigator Vickie Currie, having served her purpose in the political game, was transferred to the animal control division of the Madison Police Department.

COUNT  I
VIOLATION OF STATUTE 42 U.S.C. § 1983
(BUTLER SNOW, CLARK, CITY OF MADISON, HAWKINS-BUTLER,
WALDROP, HARRISON, CURRIE, AND JOHN DOES 1 - 10)

. . .

COUNT  V
CIVIL CONSPIRACY
(ALL DEFENDANTS)

¶ 281. Plaintiffs incorporate and reallege each of the foregoing paragraphs as if fully set forth herein.

¶ 282. Defendants conspired and colluded together to wrongfully arrest and prosecute Mark Mayfield for a crime he did not commit, thereby depriving him of his state and federal constitutionally protected rights.

¶ 283. As a result, Plaintiffs were damaged in an amount to be fully proven at the trial of this matter.

These factual allegations, taken as true and viewed in the light most favorable to the Plaintiffs, are sufficient and plausible on their face to support an inference that Wilbourn conspired with the other Defendants to deprive Mark of his Constitutional rights. Conspiracies to commit wrongs are by their very nature secretive and may have to be proved by circumstantial evidence.

Additionally, in their previous responses to motions to dismiss filed by Butler Snow and Don Clark [ECF Doc. 27, 28] and Gene Waldrop, Vicki Currie and Chuck Harrison [ECF Doc. 31, 32], Plaintiffs demonstrated that the Amended Complaint pleads sufficient factual allegations to support their negligent infliction of emotional distress and wrongful death claims. As to Wilbourn, assuming for the time being that Mark's death was correctly ruled a suicide, Wilbourn's conduct, both in participating in the conspiracy and individually, gives rise to a claim for wrongful death in that his actions resulted in an irresistible impulse in Mark to self-harm. The following additional excerpts from the Amended Complaint further demonstrate that it states a claim plausible on its face against Wilbourn:

¶ 53 The day following his arrest, Mark's largest client, Trustmark National Bank, moved all of its business away from Mark, resulting in a complete collapse of his law practice.

¶ 54 Mark began to lose sleep and became depressed. After his arrest, Mark's doctor prescribed a number of medications for sleep, depression, and anti-anxiety assistance.

¶ 74 Wilbourn was involved with the Tea Party and befriended Mark Mayfield after they became acquainted through Tea Party activities. Mark, always kind and generous, invited Wilbourn and his daughters to join Mark and his family for dinners, tailgating at Ole Miss ball games, and spending time at the Mayfields' Oxford condo, and to join the Mayfields for Thanksgiving dinner in 2013.

¶ 75 Wilbourn knew that Senator Cochran's wife lived at St. Catherine's Village, where Mark Mayfield's mother also resided.

¶ 76 Wilbourn, like others, thought that exposing Senator Cochran's rumored affair would help McDaniel in his campaign.

¶ 82 …Wilbourn assured Mark he would take everything from there.

¶ 89 On May 14, 2014, Wilbourn sent Mark an email message referencing Senator Cochran having a mistress and referring to Rose Cochran's room number at St. Catherine's Village.

¶ 96 The same day that Kelly was arrested, Wilbourn and Mark had planned to do some campaigning for McDaniel during skull races at the Ross Barnett Reservoir.

¶ 97 After they finished, Mark got a call from Wilbourn. Wilbourn said Mark had left something at his house and needed to come pick it up.

¶ 98 Once there, Wilbourn told Mark that they could no longer have contact with each other and cut ties.

¶ 99 On May 22, 2014, John Mary, Richard Sager, and Mark Mayfield were also arrested for conspiracy to commit a felony, exploitation of a vulnerable adult.

¶ 100 On information and belief, Wilbourn retained an attorney that same day.

¶ 101 Having abandoned Mark in his time of need, after Mark's arrest, Wilbourn left a handwritten note on the Mayfields' front door saying he was sorry this had happened. Mark kept the note for a while, but weeks later, asked Robin to shred it.

¶ 102 Richard Wilbourn was listed as a potential witness for the prosecution in Clayton Kelly's trial. When the Clarion-Ledger newspaper attempted to speak to him for a story it ran on June 4, 2015, he could not be reached for comment. Nor has he ever made one.

¶ 103 Nonetheless, both at Kelly's arraignment and when he pled guilty and received his sentence, Wilbourn was observed in the courtroom

¶ 104 Despite their knowledge of Wilbourn and his involvement in spearheading the attempts to obtain Rose Cochran photographs, on June 18, 2015, the Madison County District

Attorney's Office made published statements to the Clarion-Ledger that there were no other persons involved.

¶ 106  Instead of identifying Richard Wilbourn as the person who instructed Kelly on where Rose Cochran's room was and how to get into the facility, authorities expressly said it was Mayfield…

¶ 107 Instead, an Assistant District Attorney went even further and told the press, "We have no evidence that Mark Mayfield came into St. Catherine's with anyone else from the time of this mother's death until the video was taken on April 20th (2014). We have thoroughly been through all the surveillance videos." Quite simply, both statements are untrue.

¶ 211  Despite the investigation, and despite his involvement in scouting and mapping St. Catherine's Village and conveying the information on location and access to Kelly, Richard Wilbourn was never arrested or charged with any crime.

¶ 230  …Over 60 years of the Mayfield law practice vanished overnight.

¶  231  Mark reached out to his friend Richard Wilbourn, who he thought would provide support, particularly since he had been the one who fed Clayton Kely the information on accessing St. Catherine's Village. Wilbourn and Mark met up a few times at a community swimming pool in Bridgewater to talk. To Mark's obviously distressed state, Wilbourn proffered reassurance and platitudes, all the while covering his own tracks and leaving Mark to take the fall.

¶ 232  With no work or ability to participate in Tea Party or McDaniel Campaign activities as the result of his arrest, Mark was forced into isolation. He lost interest in and the ability to participate in the things he formerly loved in life, lost weight, and was unable to sleep.

¶ 234  On June 27, 2014, three days later, Robin Mayfield woke up to find Mark's side of the bed empty. She found him on the floor of the storage room, a gun in his hand and a bullet hole in his head. She then had to call her two sons and tell them that their father was dead.

¶ 237 Though Mark and Robin had planned to retire in the house that they lived in for nine years, Robin was not able to relive that horror [of finding Mark dead] on a daily basis. Robin sold the home. Robin suffers from post-traumatic stress disorder and has to take prescriptions for anxiety, and to prevent the panic attacks that she began suffering after the death.

¶  242  In short, those who were deemed the most easily expendable—by…Richard Wilbourn—took the fall; Wilbourn was able to use his money and connections to avoid being charged…

COUNT  III
NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (ALL DEFENDANTS)

¶ 270  Plaintiffs incorporate and reallege each of the foregoing paragraphs as if fully set forth herein.

¶ 271  The Defendants could reasonably foresee that their intentional and/or negligent acts would result in emotional harm and distress to any "co-conspirators," including Mark Mayfield and his family.

¶  272 Mark Mayfield did, in fact, suffer mental and emotional distress as the result of the Defendants' acts. Mark Mayfield's mental and emotional distress manifested itself via demonstrable harm during the period preceding his death.

¶ 273 Robin Mayfield also suffered mental and emotional distress as the result of the Defendants' acts, both after Mark's arrest and after his death continuing to the present day.

¶ 274  As a result, Plaintiffs have been damaged and in an amount to be fully proven at the trial of this matter.

COUNT IV
WRONGFUL DEATH (ALL DEFENDANTS)

¶ 275  Plaintiffs incorporate and reallege each of the foregoing paragraphs as if fully set forth herein.

¶ 276  The wrongful and negligent acts and omissions of Defendants were a direct, substantial, and proximate cause of the emotional distress and death of Mark Mayfield.

¶  277 Alternatively and/or additionally, Richard Wilbourn's intentional actions caused Mark Mayfield to experience an irresistible impulse to commit suicide.

¶ 280  Plaintiffs are entitled to damages under Mississippi Code Annotated § 11-7-13, and for non-economic damages for loss of consortium.
matter.

These factual allegations, taken as true and viewed in the light most favorable to the Plaintiffs, are sufficient and plausible on their face to support an inference that Wilbourn's intentional wrongful acts resulted in the wrongful death of Mark and, if his death was correctly ruled a suicide, that these acts resulted in a diminished mental state that resulted in an irresistible impulse in Mark to self-harm. They further support an inference that Wilbourn's actions negligently inflicted emotional distress on Mark, Robin, Owen, and William Mayfield.

**III.    The Amended Complaint's allegations are legally sufficient to show a civil conspiracy to violate Constitutional rights.**

It is well-established that when a private person conspires or colludes with a government official to arrest or search a person without probable cause, and thereby violate Fourth Amendment rights, the private person so colluding is liable for damages under 42 U.S.C. § 1983.

> "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute. To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents . . . ."

*Sparks v. Duval County Ranch Co.*, 604 F.2d 976, 982 (5th Cir. 1979) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970) (quoting *U.S. v. Price*, 383 U.S. 787, 794 (1966)(citation omitted)). Even if the government official escapes liability by some form of immunity, and the § 1983 case against the government dismissed, the private person who conspired with such government official may be held liable under a § 1983 cause of action. *Dennis v. Sparks*, 449 U.S. 24 (1980). A conspiratorial agreement can be a "tacit understanding," *United States v. Sabhnani*, 599 F.3d 215, 244 (2d Cir. 2010), and a person "can be a conspirator by agreeing to facilitate only some of the acts leading up to the substantive offense." *Salinas v. United States*, 522 U.S. 52, 65 (1997).

Conspiracies are by their nature secretive operations. As such, they may have to be proved by circumstantial rather than direct evidence. *See, e.g.*, *Pangburn v. Culbertson*, 200 F.3d 65 (2nd Cir. 1999); *Rounseville v. Zahl*, 13 F.3d 632 (2nd Cir. 1994). A plaintiff may prove her case by circumstantial as well as direct evidence. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 714 note 3 (1983). Inferences —commonly described as circumstantial evidence — are as capable of providing evidentiary support as direct evidence. *See Doe v. United States Postal Service*, 317 F.3d 339, 343 (D.C.Cir. 2003)("[W]e generally draw no distinction between the probative value of direct and circumstantial evidence."). "[J]uries are routinely

instructed that `[t]he law makes no distinction between the weight or value to be given to either direct or circumstantial evidence.'" *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) "The reason for treating circumstantial and direct evidence alike," the Supreme Court has explained, "is both clear and deep rooted: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" *Id.* (quoting *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 508 n. 17 (1957)).

The Amended Complaint alleges specifically that Butler Snow's Don Clark discussed his plans for criminal prosecution with Madison Mayor Mary Hawkins-Butler. Then, both spoke to Madison's police chief about pursuing the target criminal prosecutions. (Compl. ¶ 161). The Amended Complaint goes on to allege facts sufficient to infer that Wilbourn was involved in this conspiracy as (1) the authorities knew that Wilbourn was the person who called and gave Kelly instructions on getting into St. Catherine's, (2) with that knowledge, the authorities falsely stated that it was Mark, (3) Wilbourn was listed as a witness for the prosecution at the trial of Clayton Kelly, and (4) Wilbourn was present at the trial of Clayton Kelly, apparently prepared to testify for the prosecution based upon collusion with the Madison Police Defendants in the entire political prosecution scheme. These specific factual allegations are legally sufficient.

## IV. The Amended Complaint's allegations are legally sufficient to show Wilbourn is liable for the wrongful death of Mark Mayfield.

The Mississippi Supreme Court's "seminal case addressing wrongful death claims stemming from suicide is *State for Use and Benefit of Richardson v. Edgeworth*, 214 So. 2d 579 (Miss. 1968))." *Truddle v. Baptist Mem'l Hospital-Desoto, Inc.,* 150 So. 3d 692, 698, 2014 Miss. LEXIS 556 (Miss. 2014) (King, J., Dissenting). Whereas Wilbourn would have the Court treat *Truddle* as controlling[3], the applicable rule in *Edgeworth* and other federal district courts show

---

[3] As explained further *infra*, *Truddle* is distinguishable.

that the Mayfields' Amended Complaint meets their burden of stating a claim for wrongful death against Wilbourn and showing that there are genuine issues of fact to be decided regarding said claim.

In *Edgeworth*, the plaintiffs—a widow on behalf of herself, her deceased husband, and her children—brought a wrongful death action against two justices of the peace and deputy sheriffs for the wrongful death of the decedent by suicide. The plaintiffs alleged that the intentional abuse of the legal process by the defendants led the decedent to commit suicide. *Edgeworth*, 214 So. 2d at 581. The Supreme Court reversed the lower court's grant of a directed verdict in favor of the defendants, and remanded the case to circuit court for a full trial on the merits. *Id.* The Supreme Court agreed with other courts that had considered wrongful death in the context of suicide and reasoned, "Where a defendant has committed an intentional tort [such as abuse of process], <u>questions of whether the deceased was induced to take his life by an irresistible impulse and whether the intentional tort was a substantial factor in causing the suicide are ordinarily issues for the jury.</u>" *Id.* at 586 (citing *Cauverien v. De Metz,* 20 Misc. 2d 144, 188 N.Y.S. 2d 627 (1959)) (emphasis added). It concluded, "We hold that where the suicide is committed in response to an uncontrollable impulse, recovery may be had if the mental state of [the] deceased was substantially caused by the defendants' intentional wrongful acts, and whether they were substantial factors in bringing about the death by suicide may be issues for the jury." *Edgeworth*, 214 So. 2d at 587 (citing *Cauverien*, *supra;* Speiser, Recovery for Wrongful Death § 2:7 (1966); Prosser, Torts 302 (3d ed. 1964)).

Several factual similarities to the case at bar are of further note. In *Edgeworth*, the alleged intentional acts and abuse of process involved warrants issued improperly (warrants issued on

defective affidavits, no less)[4] and abuse of the judicial process to intimidate and punish the decedent (for debts he owed)[5]. The conduct of the defendants—using the judicial process to criminally prosecute the decedent resulting in "intense" "economic pressures" on the decedent and his family--went on for "several weeks" prior to his death. *Edgeworth*, 214 So. 2d at 583. When the decedent actually committed the act of suicide, neither justice of the peace that was sued for wrongful death was present or even knew anything about the decedent's mental state. It was enough that their intentional acts in executing defective warrants in order to punish the decedent may have proximately caused in him a "fear of prison under these pressing emotional circumstances" that "manifested itself as an uncontrollable impulse." *Id.* at 584.

Here, the Plaintiffs' Amended Complaint alleges that Wilbourn intentionally participated in the conspiracy to arrest Mark Mayfield (and others) on criminal charges lacking probable cause, and to prosecute him accordingly. *See, e.g.,* Compl. ¶ 219. It further alleges that, as in *Edgeworth*, this abuse of the legal process in which Wilbourn participated resulted in Mark facing intense economic pressure due to losing his largest client, Trustmark Bank. Compl. ¶ 221. The emotional and mental anguish Mark endured certainly included, like in *Edgeworth*, a fear of prison. Furthermore, in addition to his participation in the conspiracy, the Plaintiffs have alleged additional acts by Wilbourn that will be further explored through discovery for a trier of fact to properly consider. *See Edgeworth*, 214 So. 2d at 587. These additional facts include those that would support an inference that, for instance: Wilbourn used his money to influence authorities and avoid prosecution (Compl. ¶¶ 102, 104-107, 211, 242); Wilbourn agreed to cooperate with the prosecution in order to avoid being named (Compl. ¶¶ 102-103, 105-106); and Wilbourn is tied to videos missing from St. Catherine's Village (Compl. ¶¶ 80, 81, 82, 107). A reasonable jury could

---

[4] *Cf.* Compl. ¶¶ 203, 204.
[5] *Cf.* Compl. ¶ 219.

determine that these additional intentional wrongful acts provide further support for a finding that Wilbourn's conduct was a substantial factor in the death of Mark Mayfield.

Wilbourn's Motion further suggests that the wrongful death cause of action can be addressed in a vacuum from the other claims at issue and somehow thereby avoid application of the three-year statute of limitations (discussed *infra*) and/or that his participation in the conspiracy to deprive Mark of his Constitutional rights is somehow differentiated from intentional acts that a reasonable trier of fact could conclude led to an irresistible impulse to self-harm. That is simply not the case. The Amended Complaint makes clear that Mark's wrongful death flows from the wrongful arrests stemming from the Rose Cochran Incident and the conspiracy to violate Mark's Constitutional rights (the § 1983 claim); Wilbourn was involved in both the Rose Cochran Incident and the conspiracy. He cannot separate the wrongful death claim from the interconnected § 1983 and conspiracy claims.

Wilbourn further claims (in an allegation that is outside the facts of the Amended Complaint) that he last interacted with Mark "well before" the day of his death. The conclusion he asks the Court to draw from that is that there exists a requirement for some sort of temporal proximity to support a claim of "irresistible impulse" in a wrongful death claim involving suicide. However, there is no binding authority to suggest that the intentional act by Wilbourn had to have been contemporaneous with or immediately preceding the death. Indeed, Wilbourn offers none. Rather, as *Edgeworth* recognizes, an intentional act to abuse the legal process can have been ongoing for "weeks" before a suicide and still be sufficient to be presented to a jury for determination of whether it supports a wrongful death claim in the context of irresistible impulse[6].

---

[6] To the extent that Wilbourn's Motion makes new allegations not asserted in the Amended Complaint (that Mark made preparations to commit suicide and left a note), the Court should strike these allegations for the reasons set forth in Plaintiffs' Motion to Strike [ECF Doc. 45]. Even if the Court were to consider them, they would not preclude a finding that Plaintiffs can state a claim for wrongful death. For instance, in *Fuller v. Preis,* 35 N.Y. 2d 425, 322 N.E. 2d 263, 268 (N.Y. 1974), the court held a jury could find irresistible

Wilbourn goes on to claim that the Amended Complaint does not allege any intentional act by Wilbourn that would have proximately caused Mark to reach an emotional and mental state where he would have an irresistible impulse to take his life. This simply is not the case. The United States District Court for the District of Massachusetts cited the Mississippi standard as articulated in *Edgeworth* in denying a motion to dismiss a claim for wrongful death. That court's reasoning is instructive. *North Shore Pharm. Servs. v. Breslin Assoc. Consulting LLC,* 2004 U.S. Dist. LEXIS 31270, 2004 WL 6001505 (D. Mass. June 22, 2004). In *North Shore*, Breslin Associates (the company that bore the deceased's name, along with his widow) alleged that Omnicare (the party against whom wrongful death was alleged) had undertaken a meritless legal action against Breslin that was brought for purposes of retaliation (in order to keep Breslin quiet about improper billing practices he had discovered). Breslin specifically alleged that, as a result of Omnicare's suit filed in 2002, "the annual income of Breslin dropped from approximately $200,000 in 2002 to zero in 2003, and the reputation of Mr. Breslin and his company were 'irreparably tarnished.'" *Id.* at *7 (quoting Breslin's counterclaim). Breslin also alleged that (again, quoting Breslin's counterclaim) "Mr. Breslin suffered great mental anguish, emotional distress, and other psychological, physical and economic injuries which culminated in his taking his own life on June 4, 2003." *Id.* at *7-8.

In evaluating if Breslin sufficiently stated a claim to survive Omnicare's motion to dismiss the claim of wrongful death, the district court was unpersuaded by an argument that Omnicare's conduct "was not intentionally tortious as a matter of law and thus cannot serve as the basis for liability." *Id.* at *17. Omnicare had attempted to argue that although Breslin alleged that Omnicare spoke ill of Mr. Breslin's abilities and refused to deal with him, it did not amount to legal defamation or abuse of process and therefore, could not constitute an intentional wrong that would

---

impulse when the decedent had planned his suicide, written suicide notes, changed his will two days before his death, and acquired a gun. *See also Orcutt v. Spokane County*, 364 P. 2d 1102 (Wash. 1962) (evidence showed irresistible impulse even when decedent attempted suicide multiple times over several months).

support a wrongful death claim. The court was unpersuaded and found, "as an initial matter, there is no support for Omnicare's position that each action it undertook must be viewed and analyzed in isolation." *Id.* at *17-18[7]. The court concluded, citing *Edgeworth*, that because Breslin alleged that Omnicare brought a baseless lawsuit in order to silence Breslin and prevent "legitimate inquiry into Omnicare's billing practices," it could support an abuse of process claim. As such, Breslin had "asserted sufficient intentional conduct on the part of Omnicare to support a claim for wrongful death by suicide." *Id.* at *22-23.

Here, the Mayfields have alleged that Wilbourn participated in the conspiracy to deprive Mark of his constitutional rights. Similar to the retaliatory lawsuit against Breslin, here, the arrest and prosecution of Mark was for retaliatory, political purposes, to exact revenge on Mark for supporting Cochran's opponent. The Mayfields further alleged that the conspiracy in which Wilbourn participated, Mark's arrest effected by that conspiracy, and the fallout from Mark's arrest resulted in essentially the same things that Mr. Breslin suffered--the loss of his career and reputation, along with mental, psychological, physical, and economic injuries. Here, too, all of this financial and emotional turmoil culminated with Mark's death.

Like Omnicare's actions in Breslin, Wilbourn's conduct cannot be viewed in isolation from the conspiracy of which he was a part. Further, the actions alleged that he took individually with respect to Mark (after being a supposed friend and ally in wanting to expose the Cochran affair, then flipping and using his money to help assist and induce prosecutors to target Mark and others), further support a finding that the legal process was abused and that, as in *North Shore*, each individual action by Wilbourn cannot be separated from the full picture. Furthermore, the Amended Complaint alleges sufficient facts to support an allegation that Wilbourn took actions

---

[7] It went on to note that in addition, even though not necessary, because the Breslin's complaint sufficiently stated causes of action for intentional infliction of emotional distress, they could serve as an <u>additional</u> basis for a wrongful death action.

individually in order to have Mark (and others) arrested and prosecuted in the public eye in order to prevent inquiry into his own involvement. As such, both the conspiracy allegations and the Wilbourn-specific allegations are enough to support a claim for wrongful death by suicide.

**V.    The Amended Complaint allegations are legally sufficient to show Wilbourn is liable for negligent infliction of emotional distress.**

Wilbourn argues that Mississippi law bars a claim of negligent infliction for emotional distress because Mark's death was ruled a suicide and severed the causal nexus between Wilbourn's conduct and Mayfield's damages. He further argues that the Amended Complaint contains no allegations that would foreseeably cause Mark, Robin, or their sons any emotional distress. Wilbourn correctly cites some principles of the law regarding suicide, as far as they go. However, the law he cites is not controlling in the present case. Under applicable law, the Amended Complaint's allegations sufficiently state a claim.

*Truddle v. Baptist Mem'l Hospital-Desoto Inc.*, 150 So. 3d 692 (Miss. 2014) concerned a medical malpractice and wrongful death suit against doctors at the Baptist Memorial Hospital after a woman's son committed suicide while in treatment at that hospital. *Id.* at 694-95. *Collums v. Union Planters Bank, N.A.*, 832 So. 2d 572 (Miss.Ct.App. 2002) likewise concerned a wrongful death and emotional distress claim brought against Union Planters Bank for its business practices which were alleged to have caused a suicide. *Id.* at 575. For purposes of the negligently-inflicted emotional distress on Robin and her sons, however, the foregoing authority does not serve as a bar to any claims, since those cases all dealt with attempts by the deceased's estate to seek damages for the suicide itself, not for the emotional distress caused to third-party family members.

As discussed *infra*, Plaintiffs' claims for wrongful death allege irresistible impulse and intentional acts. However, conduct which is intentional as to one party may be negligent as to others. Mississippi law recognizes that third-party bystanders can suffer emotional injury after

observing the suffering of a close family member. In *Entex, Inc. v. McGuire*, 414 So. 2d 437, 444 (Miss. 1982), for example, a husband could sue after a gas main explosion, not for any injuries suffered by him personally, but because he witnessed his wife's injury in the explosion. The Mississippi Supreme Court, adopting California law, propounded the following factors "as important in determining whether a defendant should reasonably foresee injury to a plaintiff, thereby owing a duty of care:

> (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

*Summers v. St. Andrew's Episcopal Sch.*, 759 So. 2d 1203, 1210 (Miss. 2000) (citing *Entex*, 414 So. 2d at 444) (internal citations omitted). Thus, the question is, taking the allegations of the Amended Complaint as true, whether Wilbourn could have reasonably foreseen that his conduct toward Mark would emotionally distress his wife Robin and his sons.

As alleged in the Amended Complaint, after effectively masterminding Clayton Kelly's photographing Rose Cochran (Compl. ¶¶ 83-88) and after gaining information from Mark under false pretenses (*Id.* ¶¶ 74-82), Wilbourn then immediately disavowed Mark and his family (*Id.* ¶¶ 96-98; 100-101) while conspiring with his co-defendants to have Mark take the fall (*Id.* ¶¶ 102-106; 211; 231; 242). This resulted in Mark losing his law practice and potentially facing imprisonment. On June 27, 2014, Robin "woke up to find Mark's side of the bed empty. She found him on the floor of the storage room, a gun in his hand and a bullet hole in his head. She then had to call her two sons and tell them that their father was dead." (*Id.* ¶ 234). "Robin suffers from post-traumatic stress disorder and has to take prescriptions for anxiety, and to prevent the panic attacks that she began suffering after the death." (*Id.* ¶ 237).

Given the foregoing (which, as noted *infra*, is based on the limited factual information available to Plaintiffs because of Wilbourn's successful avoidance of discovery), Robin and her sons were clearly foreseeable plaintiffs of Wilbourn's negligent and intentional conduct. Wilbourn used Mark as a pawn in a political conspiracy of his own design and then hung Mark out to dry, resulting in the destruction of Mark's career, reputation, and his eventual death, forcing Robin to discover his body. Whether Wilbourn's conduct, under the totality of the circumstances, made Robin, William, and Owen Mayfield's emotional distress reasonably foreseeable to him is a question of fact best decided by a jury after the benefit of discovery, and Wilbourn's Motion to Dismiss should accordingly be denied.

## VI.    Wilbourn fails to satisfy the elements of judicial estoppel; moreover, Wilbourn's argument for judicial estoppel improperly introduces matters outside of the Amended Complaint and should be stricken.

Wilbourn appeals to the doctrine of judicial estoppel in a last-ditch attempt to avoid the Mayfields' claims. At the outset, it must be noted that Wilbourn's judicial estoppel argument relies upon documents and facts not part of the Amended Complaint and, therefore, is improper. This is the subject of the Plaintiffs' Motion to Strike [ECF Doc. 45], which is adopted and incorporated herein by reference. The Court should disregard Wilbourn's judicial estoppel argument for the reasons more fully detailed in the Motion to Strike. It is not properly raised in response to a motion to dismiss.

Moreover, even if considered, Wilbourn's claim of judicial estoppel fails on its own merits. Wilbourn's claim of judicial estoppel is predicated on an earlier complaint for discovery filed by Mayfield against Wilbourn in the Chancery Court of Madison County. *See* [ECF Doc. 35-2]. In that complaint for discovery, after setting forth an abbreviated version of the same factual allegations contained in the instant Amended Complaint, the Plaintiffs alleged, "On information and belief, [Wilbourn], among other things, may have engaged in negligent and/or tortious actions

that harmed Mr. Mayfield and his business, embarrassed and humiliated him, caused severe emotional distress, and caused his death." *Id.* ¶ 14. The complaint for discovery went on to state, "Wilbourn has information, knowledge, and other evidence relevant to the events leading up to and surrounding Mark Mayfield's death. However, Plaintiffs are effectively prohibited from obtaining such information and evidence except through discovery." *Id.* ¶ 17.

That complaint for discovery was filed on January 18, 2017. *See id.* Over the next several months, the Mayfields attempted to gain information about the events leading up to Mark's death, both through the complaint for discovery and independent investigation. After obtaining additional information, and after the dismissal of the Madison County complaint for discovery, they filed the instant suit. Of note, for all of Wilbourn's handwringing about unfair discovery practices, he fails to mention that due to his continued attempts to prevent discovery, the Plaintiffs received exactly nothing from him through either the Hinds County or Madison County complaints for discovery.

"Generally, judicial estoppel is applicable where there has been more than one lawsuit between the same parties and one party knowingly asserts a position inconsistent with that taken in the prior litigation." *Illinois Cent. R.R. v. Haymer*, 1998 Miss. App. LEXIS 931, *4 (citing *Mississippi Transportation Commission v. Bridgforth*, 709 So. 2d 430, 435 (Miss. 1998). "The purpose of judicial estoppel is to prevent parties from knowingly taking a position in one court that is contrary to a position that party has asserted in, and that has been accepted by, another court." *Clark v. Neese*, 131 So. 3d 556, 562 (Miss. 2013). "The basic premise behind the doctrine is that parties should not be permitted to assert inexplicably contrary positions in separate lawsuits. 'Inexplicable' requires that any explanation be reasonable." *Haymer*, 1998 Miss. App. LEXIS 931, *4-5.

In Mississippi, there are three elements of judicial estoppel. A party will be judicially estopped from taking a subsequent position if (1) the position is inconsistent with one previously

taken during litigation, (2) a court accepted the previous position, and (3) the party did not inadvertently take the inconsistent positions. *Clark*, 131 So. 3d at 560 (citing *Kirk v. Pope*, 973 So. 2d 981, 991 (Miss. 2007)). "[C]ircumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle," but several factors typically inform the process: (1) the "later position must be 'clearly inconsistent' with [the party's] earlier position," (2) the party must have persuaded a court to accept the earlier position, and (3) the party "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Rodwell v. Stieffel*, 126 So. 3d 915, 921-22 (Miss.Ct.App. 2013) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750-51, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001)). Given this standard, Wilbourn's claim of judicial estoppel fails both due to the lack of any inconsistent positions and the lack of any acceptance of the "previous" position.

First, judicial estoppel is inapplicable because the Plaintiffs have not taken inconsistent positions—as the complaint for discovery plainly shows, it was, is, and always has been the Mayfields' contention that Wilbourn committed tortious actions that damaged Mark and his family. The fact that the Mayfields initially believed that there was insufficient information to file suit is not a "position" made "inconsistent" by filing the instant suit—rather, filing the instant suit was necessitated both by the statute of limitations and the dismissal of the Madison County complaint for discovery finding that their complaint for discovery sufficiently supported a complaint for relief in a court of competent jurisdiction.

Second, judicial estoppel is inapplicable because no court has accepted the alleged "prior position." As noted in the improperly attached transcript, the Hinds County Chancery Court quashed subpoenas issued by the Plaintiffs to which Wilbourn objected (*see* ECF Doc. 35-1, pp. 8-10); in that same transcript, the Madison County Chancery Court dismissed the second complaint for discovery, reasoning, "Because discovery is available in the appropriate circuit court

proceeding, I'm granting the motion to dismiss." *Id.* p. 65. (Emphasis added). Even if the Plaintiffs' positions were somehow deemed inconsistent (they are not), there is no evidence that the Madison County Court accepted their position that a complaint for discovery was proper—to the contrary, that court explicitly refused to accept the position that a complaint for discovery was appropriate, and instructed Plaintiffs, based on the facts alleged, to file a complaint for relief elsewhere. Absent acceptance of the prior position, there are no grounds for judicial estoppel. *See Clark*, 131 So. 3d at 562 ("But we need not determine whether Helen's positions actually were knowingly inconsistent because we find it abundantly clear from the record that, when the federal district court denied Sullivan's motion for summary judgment, he was not required to accept or rely on Helen's prior position — an absolute requirement for the application of judicial estoppel.").

Lastly, there are no equitable grounds for imposing judicial estoppel. As noted *supra*, despite two complaints for discovery, Wilbourn was never compelled to turn over a single document or to sit for a deposition. The Mayfields have not obtained any unfair advantage in the instant suit, nor Wilbourn suffered any detriment, as a result of the complaints for discovery[8]. *See Gibson v. Williams*, 186 So. 3d 836, 846 (Miss. 2016) ("Judicial estoppel is designed to protect the judicial system and applies where 'intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.'") (quoting *Kirk,* 973 So. 2d at 991). *See also Rodwell*, 126 So. 3d at 922 ("CAL Investments raised as affirmative defenses to the enforcement of Note 1 that Note 2 and the CSA acted as settlement and release of claims regarding Note 1. The circuit court agreed with this argument and denied summary judgment to Stieffel on Note 1 and enforced Note 2 and the CSA…. To allow CAL Investments to now argue that Note 2 and the CSA are unenforceable, a position inconsistent with its affirmative defenses, would thwart the purpose and logic of the doctrine of judicial estoppel.")

---

[8] If anything, it is Wilbourn who has obtained an advantage by thus far having avoided any production.

In short, Wilbourn cannot establish (1) the existence of an inconsistent position, (2) acceptance of the prior position, or (3) equitable cause to apply judicial estoppel, even after improperly attaching extraneous documents to its Motion to Dismiss. Accordingly, Wilbourn's argument should be disregarded.

**VII.    Plaintiffs' claims are timely.**

**A.    Section 1983 claims.**

A claim for relief under 42 U.S.C. § 1983 must contain two elements: (1) that plaintiff has been deprived of a right secured by the Constitution or laws of the United States; and (2) that the defendant acted under color of state law. *Fyfe v. Curlee*, 902 F.2d 401, 403 (5th Cir. 1990); *Wong v. Stripling*, 881 F.2d 200, 202 (5th Cir. 1989). A plaintiff must also prove that the alleged constitutional or statutory deprivation was intentional or due to deliberate indifference--not the result of mere negligence. *See Farmer v. Brennan*, 511 U.S. 825, 828-29 (1994); *Davidson v. Cannon*, 474 U.S. 344, 348 (1986). The negligent deprivation of life, liberty, or property is not a constitutional violation. *See Campbell v. City of San Antonio*, 43 F.3d 973, 977 (5th Cir. 1995); *Fraire v. City of Arlington*, 957 F.2d 1268, 1276 (5th Cir. 1992). Moreover, to hold a defendant liable under § 1983, a plaintiff must adduce facts demonstrating the defendant's participation in the alleged wrong. *See Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992).

The limitations period for a § 1983 claim is determined by the forum state's statute for personal injury actions. *See Owens v. Okure*, 488 U.S. 235, 249-50 (1989). In Mississippi, § 1983 suits are governed by the general statute of limitations, which requires the commencement of an action within three years of the action's accrual. *See* Miss. Code Ann. § 15-1-49; *see also James v. Sadler*, 909 F.2d 834, 836 (5th Cir. 1990) (finding in § 1983 suit that "the three year residual period provided by Section 15-1-49, Miss. Code Ann. applies").

While the State statute of limitations is borrowed for purposes of a § 1983 action, federal law governs when a cause of action accrues. *See Wallace v. Kato*, 549 U.S. 384 (2007). However, federal courts typically apply the forum state's tolling principles. *See Hardin v. Straub*, 490 U.S. 536, 538-39 (1989); *Gartrell v. Gaylor*, 981 F.2d 254, 257 (5th Cir. 1993) (noting that state's tolling provisions apply to application of forum state's statute of limitations in § 1983 action). A cause of action accrues under federal law when the action is "complete and present," which is "when the plaintiff can file suit and obtain relief." *Id.* (internal citations and citation omitted). When the plaintiff knows or "has sufficient information" to know that he has suffered an injury, his cause of action accrues from that moment. *Rodriguez v. Holmes*, 963 F.2d 799, 803 (5th Cir. 1992) (citation omitted). An invasion of a legally protected interest ordinarily occurs at the time the tortious act is committed, but a plaintiff must bring suit upon "discernible" injury. *See Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 228 (5th Cir. 1989). When "the plaintiff is, or should be, aware of both the injury and its connection with the acts of the defendant" the limitations period for a § 1983 claim accrues. *See Lavellee v. Listi*, 611 F.2d 1129, 1131 (5th Cir. 1980) (citation omitted).

Regarding the accrual of a claim, "[u]nder federal law, the [limitations] period begins to run the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured." *Piotrowski v. City of Houston*, 51 F.3d 512, 516 (5th Cir. 1995)(internal citations and quotations omitted). In *Piotrowski*, the court explained as follows:

> A plaintiff's awareness encompasses two elements: (1) The existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions. *See Stewart v. Parish of Jefferson*, 951 F.2d 681, 684 (5th Cir.) ("The statute of limitations period commences once the plaintiff acquires possession of two critical facts: (1) an injury has occurred; and (2) the identity of the person who inflicted the injury."), *cert. denied*, 506 U.S. 820, 113 S. Ct. 69, 121 L. Ed. 2d 35 (1992). A plaintiff need not realize that a legal cause of action exists; a plaintiff

need only know the facts that would support a claim. *See Harrison v. United States*, 708 F.2d 1023, 1027 (5th Cir. 1983) ("The plaintiff need not have knowledge of fault in the legal sense for the statute to begin to run, but she must have knowledge of facts that would lead a reasonable person (a) to conclude that there was a causal connection … or (b) to seek professional advice, and then, with that advice, to conclude that there was a causal connection between the [defendant's acts] and injury."). Moreover, a plaintiff need not have actual knowledge if the circumstances would lead a reasonable person to investigate further. *See Jensen v. Snellings*, 841 F.2d 600, 606 (5th Cir. 1988) ("Under federal law, the limitations period commences when 'the aggrieved party has either knowledge of the violation or notice of facts which, in the exercise of due diligence, would have led to actual knowledge' thereof." (*quoting Vigman v. Community Nat'l Bank & Trust Co.*, 635 F.2d 455, 459 (5th Cir. 1981))).

*Id. See also Freeze v. Griffith*, 849 F.2d 172, 175 (5th Cir. 1988) ("A state statute of limitations imposed in a § 1983 action does not run until the plaintiff is in possession of the 'crucial facts' that he has been hurt and the defendant is involved.").

Sometimes the amount of time that elapses between awareness of an injury and accrual of a cause of action can be significant. For example, in *Moore v. Franklin County*, 638 F. Supp. 2d 703 (S.D. Miss. 2009), the Plaintiffs, siblings of two African-American men kidnapped and murdered in May 1964, filed suit against Franklin County, Mississippi, for the actions of its former sheriff in conspiring with members of the Ku Klux Klan in committing the crimes. *Moore*, 638 F. Supp. 2d at 705-06. The suit was filed over forty years later, when the plaintiffs became aware of the former sheriff's involvement in the crime after a grand jury indicted one of the kidnappers, whose testimony confirmed the sheriff's role. *Id.* at 706. On a motion to dismiss, the Court held that the plaintiffs' claim under §1983 did not accrue until 2007, when the grand jury testimony was given; despite the plaintiffs' awareness of the crime back in 1964, they had no reason to discover that the County was involved or that the former sheriff lied during his initial statements about the case in 1964. *Id.* at 709.

In the instant case, the relevant "injury" and triggering event was not, as the Motion to Dismiss claims, the arrest of May 22, 2014. An arrest, even an arrest based on inaccurate or

incomplete information, is not in and of itself sufficient to trigger a cause of action under § 1983. *See Campbell*, 43 F.3d at 977. Rather, a cause of action under § 1983 accrues only when the plaintiff knew or should have known, not only of the arrest, but also that the arrest constituted a Constitutional violation for which redress could be sought under the statute. From the time of Mark's arrest until his death on June 27, 2014, neither Mark nor the Plaintiffs knew or had reason to know that the named Defendants had conspired to embarrass Mark to get political revenge as part of an ongoing Senate campaign by falsifying affidavits and both searching Mark's home and arresting him without probable cause. To the contrary, as the Amended Complaint makes clear, that month was spent by the Mark and his family dealing with the personal, professional, and public fallout from the Defendants' scheme. While they obviously knew that Mark was innocent of the crime with which he had been charged, it was only after Mark's death that the true facts underlying his arrest were discovered, and thus only then that the cause of action under § 1983 accrued.

### B.      Negligent infliction of emotional distress

Claims for negligent infliction of emotional distress arise when a defendant's negligence produces foreseeable and demonstrable emotional distress in the plaintiff. *See, e.g., Strickland v. Rossini*, 589 So. 2d 1268, 1275 (Miss. 1991). Contrary to Wilbourn's assertions, claims for negligent infliction of emotional distress are subject to the three-year statute of limitations. *See* Miss. Code Ann. § 15-1-49 (Rev. 2012). *Breeden v. Buchanan*, 164 So. 3d 1057, 1061-1062, (Miss. Ct. App. 2015). Additionally, a claim for emotional distress arising out of another's negligence must have "some physical manifestation of injury or demonstrable physical harm…." *Hudson v. Palmer*, 977 So. 2d 369, 384 (Miss.Ct.App. 2007); *see also Wilson v. GMAC,* 883 So. 2d 56 (Miss. 2004). Thus, it is not simply the awareness of emotional injury, but the physical

manifestation thereof, that triggers accrual of the cause of action. Mark and his family suffered emotional distress in two phases: first from Mark's arrest, and then from his death.

While Mark, Robin, and their sons were understandably distressed by Mark's arrest, it was only after Mark's death that Robin began to experience physical manifestations of her emotional injuries, including her current treatment for PTSD. *See* Compl., ¶ 234 ("On June 27, 2014…Robin Mayfield woke up to find Mark's side of the bed empty. She found [Mark] on the floor of the storage room, a gun in his hand and a bullet hole in his head."); ¶ 237 ("Though Mark and Robin had planned to retire in the house that they lived in for nine years, Robin was not able to relive that horror [of finding Mark dead] on a daily basis. Robin sold the home. Robin suffers from post-traumatic stress disorder and has to take prescriptions for anxiety, and to prevent the panic attacks **that she began suffering after the death**.")(Emphasis added). Owen and William's distress, which will be more fully brought out through discovery, similarly arose after Mark's death. *See* Compl, ¶ 234 ("[Robin] then had to call her two sons and tell them that their father was dead.").

Taking the allegations in the most favorable light to the Plaintiffs, as required under Rule 12(b)(6), it cannot be said that there is no set of facts which would entitle the Plaintiffs to relief. Since Robin, Owen, and William's emotional distress was only manifested in the form of physical harm after Mark's death, their claims for negligent infliction of emotional distress only accrued at the time they discovered his death, at the earliest, and their claim is accordingly timely.[9]

Additionally, to the extent that the Mayfields suffered emotional distress from Mark's arrest and prosecution, as noted above, Plaintiffs' § 1983 claim did not accrue until they

---

[9] The Motion to Dismiss also argues that Mark's death being ruled a suicide makes any negligence-based action inapplicable, citing *Truddle*, 150 So. 3d 692. As explained *supra*, *Truddle* says nothing about claims of negligent infliction of emotional distress that involve suicide. The actions involving the violation of Mark Mayfield's Constitutional rights, his wrongful arrest and the accompanying destruction of his career and public reputation caused emotional distress both in Mark and Robin, and his death caused emotional distress whose physical manifestation did not manifest until she discovered his body and which continues for Robin until the present.

discovered, <u>after Mark's death</u>, the true facts underlying his arrest and the search of his home. Plaintiffs' claim for negligent infliction of emotional distress arising out of his arrest and prosecution, then, did not accrue until the same time—when Plaintiffs discovered that Mark Mayfield's arrest, and Mark and his family's emotional distress caused by it, were not simply the byproduct of an unfortunate-but-understandable arrest based on incomplete or inaccurate (but investigated and accepted) facts, but rather a result of more insidious conduct by Wilbourn in concert with the other Defendants. Since the claim did not accrue until this discovery, it is not time-barred.

### C.      Wrongful Death

"[A] wrongful death action, since it is predicated on an underlying tort, is limited by the statute of limitation applicable to the tort resulting in the wrongful death." *Thiroux ex rel. Cruz v. Austin ex rel. Arceneaux*, 749 So. 2d 1040, 1042 (Miss. 1999). "The statute of limitations for ["wrongful-death"] claim[s], however, [can] not begin to run until, at the earliest, . . . the date of death, and the date [the wrongful-death claimant]'s damages accrued." *Univ. of Miss. Med. Ctr. v. McGee*, 999 So. 2d 837, 840 (Miss. 2008).

As stated above, the triggering and underlying action by Wilbourn was his participation in the conspiracy to violate Mark's Constitutional rights, the claim for which (under § 1983) is subject to a three-year statute of limitations. Mark Mayfield died on June 27, 2014. Accordingly, Plaintiffs' claim for wrongful death is timely.

### D.      Civil Conspiracy

A conspiracy is "a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." *Shaw v. Burchfield*, 481 So. 2d 247, 255 (Miss. 1985). The claim of civil conspiracy does not stand alone, but is dependent on conspiring to commit a particular wrong. *See Aiken v. Rimkus Consulting Grp. Inc.*, 333 F. App'x 806, 812 (5th Cir. 2009)

(per curiam) (*citing Wells v. Shelter Gen. Ins.*, 217 F. Supp. 2d 744, 755 (S.D. Miss. 2002)). Thus, the statute of limitations for a claim of civil conspiracy depends on the statute of limitations of the underlying tort. *See Sharkey v. Barber*, 188 So. 3d 1245, 1247 (Miss. Ct. App. 2016).

The Amended Complaint makes clear that Plaintiffs' civil conspiracy claim is derivative of their § 1983 claim. *See* Amended Complaint ¶ 282. As such, it could not accrue prior to the accrual of the § 1983 claim, and primarily serves to underscore the named Defendants' collective liability for the § 1983 claim. Because the § 1983 claim is timely, the civil conspiracy claim is also timely.

## <u>CONCLUSION</u>

The Plaintiffs' Amended Complaint satisfies the Well-Pleaded Complaint Rule as to its causes of action against Wilbourn. It alleges sufficient facts for a jury to infer that Wilbourn conspired and colluded with the State Actors to violate Mark's Constitutional rights. It sufficiently states a claim that Wilbourn's wrongful conduct proximately caused Mark Mayfield's death and that, if Mark's death was properly ruled a suicide, Wilbourn's conduct proximately caused an irresistible impulse in Mark to do so. Wilbourn's conduct was the foreseeable cause of the Mayfields' injuries from emotional distress. Finally, Plaintiffs are not judicially estopped from bringing their claims, which were timely filed.

WHEREFORE, PREMISES CONSIDERED, Robin Mayfield, Owen Mayfield, William Mayfield, and the Estate of Mark Stevens Mayfield, Plaintiffs herein, respectfully request that the Court DENY Defendant Wilbourn's Motion to Dismiss.

Respectfully submitted, this, the 20th day of October, 2017.

*/s/Dorsey R. Carson, Jr.*
Dorsey R. Carson, Jr., Esq. (MSB #10493)
Julie C. Skipper, Esq. (MSB #101591)
Steve C. Thornton, Esq. (MSB #9216)
*Attorneys for Plaintiffs*

*Estate of Mark Stevens Mayfield and Robin Mayfield, Owen Mayfield and William Mayfield*

**OF COUNSEL:**

CARSON LAW GROUP, PLLC
Capital Towers, Suite 1336
Jackson, MS 39201
Telephone: 601.351.9831
Facsimile: 601.510.9056
Email: dcarson@thecarsonlawgroup.com
Email: jskipper@thecarsonlawgroup.com

-and-

THORNTON LAW FIRM
P.O. Box 16465
Jackson, MS 39236
Telephone: 601.982.0313
Facsimile: 601.957.6554
Email: mail@lawlives.com

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that the foregoing has been electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

This the 20th day of October 2017.

/s/Dorsey R. Carson, Jr.
OF COUNSEL