**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**ROBIN MAYFIELD; OWEN**                                      **PLAINTIFFS**
**MAYFIELD; WILLIAM MAYFIELD;**
**THE ESTATE OF MARK STEVENS**
**MAYFIELD**

**V.**                                         **CAUSE NO. 3:17-CV-514-CWR-FKB**

**BUTLER SNOW LLP; DONALD**                                  **DEFENDANTS**
**CLARK, JR.; THE CITY OF MADISON,**
**MISSISSIPPI; MARY HAWKINS-**
**BUTLER**, *Individually and in her Official*
*Capacity*; **POLICE CHIEF GENE**
**WALDROP**, *Individually and in his Official*
*Capacity*; **CHUCK HARRISON**,
*Individually and in his Official Capacity*;
**VICKIE CURRIE,** *Individually and in her*
*Official Capacity*; **RICHARD WILBOURN,**
**III; JOHN AND JANE DOES 1-10**

**AND**

**THAD COCHRAN**                                              **MOVANT**

## ORDER

Mark Mayfield lived in Madison County, Mississippi. He and his wife, Robin, were proud parents of two sons, Owen and William. He practiced real estate law, was active in the Baptist Church, and was a founder of the Mississippi Tea Party.

In 2014, Mayfield's activism led him to volunteer for a political campaign. He enthusiastically supported State Senator Chris McDaniel's effort to unseat U.S. Senator Thad Cochran. Sadly, Mayfield's actions during that campaign would ultimately lead to his death.

Now before the Court are a variety of motions in which the defendants seek to be relieved of liability for Mayfield's passing. All will be discussed below.

I.      **Factual and Procedural History**

The following allegations and quotes are drawn from the amended complaint. They are taken as true for present purposes.

In 2014, Mississippi was due to elect someone to the United States Senate. A contentious Republican Party primary was underway. Many members of the Mississippi Tea Party supported State Senator Chris McDaniel's attempt to oust incumbent U.S. Senator Thad Cochran. Mark Mayfield was among those Tea Partiers. He got involved with the McDaniel campaign.

McDaniel supporters perceived themselves to be up against a politically and financially powerful "Republican Establishment." Cochran had been a U.S. Senator since 1978. His reelection campaign had the backing of many powerful Mississippians and institutions, including Mississippi's "most politically connected and powerful law firm"—Butler Snow LLP. The firm, based in Ridgeland, has offices throughout the southeastern United States and other parts of the country, including Washington, D.C., Boston, and Denver, and even as far away as London and Singapore. The firm's members include former Republican National Committee Chairman and Mississippi Governor Haley Barbour, former U.S. Senator David Vitter, and other ex-politicians. Cochran's reelection campaign also drew support from many other state and local politicians.

The McDaniel camp thought the Republican Establishment was playing dirty. According to the amended complaint, Butler Snow was providing legal and financial support to Cochran's campaign *and* an "independent" Super PAC supporting Cochran's reelection effort. If true, that coordination would violate federal election law. The amended complaint alleges that the Super PAC, called "Mississippi Conservatives," was organized and operated by Haley Barbour and his family. It further claims that Barbour was secretly and illegally providing financial guarantees to

Trustmark National Bank so that the Super PAC could get a bank loan. When the secret loan was finally unearthed, the Federal Election Commission fined the Super PAC $19,000.

McDaniel supporters John Mary, Rick Sager, Clayton Kelly, and Richard Wilbourn III ("the conspirators") decided to fight back. They thought Cochran was a hypocrite and an adulterer who lived with his longtime aide in Washington, D.C. while his aging wife, Rose, was left alone in a Madison, Mississippi assisted living facility called St. Catherine's Village.[1] The conspirators planned to take a photo of the bedridden Mrs. Cochran and use it in an attack ad against Cochran.

The conspirators sought Mayfield's assistance, knowing that his mother also lived in St. Catherine's Village. Mayfield refused to photograph Mrs. Cochran but agreed to "show where the room was." So in late March or early April 2014, Mayfield met Wilbourn at St. Catherine's Village. Mayfield "pointed Wilbourn down the hall . . . to where Rose Cochran's room was located."

Easter Sunday fell on April 20. That day, Kelly went to Mrs. Cochran's room and took a video of her lying in her bed. He posted an attack ad on YouTube six days later. The ad contained a still photo of Mrs. Cochran in her bed. The video went viral and was taken down in a matter of hours.

Cochran and his campaign retained Don Clark, the chairman of Butler Snow, to represent them in the Rose Cochran "incident." In mid-May, Clark told the Mayor of the City of Madison, Mary Hawkins-Butler, that the incident should be treated criminally, as it was a possible case of exploitation of a vulnerable adult. The Mayor referred him to Madison Police Chief Gene

---

[1] The aide is now Cochran's wife. Chris Cillizza, *Thad Cochran's new marriage — and why our politics stink*, WASH. POST, May 26, 2015.

Waldrop. Clark then pitched various criminal charges to Chief Waldrop and his officers. The Police Department decided to pursue the matter.

On May 16, the Madison Police Department arrested Kelly and charged him with exploitation of a vulnerable adult. At that moment Mayfield and Wilbourn were campaigning for McDaniel at the Ross Barnett Reservoir. Additional charges would later be brought against Kelly. He eventually pled guilty to burglary.

On May 22, the Madison Police Department arrested Mayfield, Mary, and Sager for conspiracy. The basis for Mayfield's arrest warrant was Officer Vickie Currie's affidavit stating that Mayfield had communicated with the other conspirators to photograph Mrs. Cochran. The police also executed search warrants on Mayfield's home and office. The basis for those warrants was Officer Chuck Harrison's affidavits indicating that Mayfield's office would have evidence that he inflicted pain on a vulnerable person. Mayfield's bond was set at $250,000.[2]

Mayfield's largest client, Trustmark National Bank, abandoned him the next day. That caused the "complete collapse of his law practice."[3] Mayfield became depressed, sought professional help, and was prescribed medication for sleep, depression, and anxiety. His wife experienced similar symptoms and was also prescribed medication.

---

[2] Dale Danks, Jr. was the municipal court judge who signed the warrants and set Mayfield's bond. Interestingly, Danks has now entered his appearance in this case as co-counsel for Mayor Hawkins-Butler. That inadvertently lends credence to the plaintiffs' beliefs about the Republican Establishment.

[3] In one of several ironies in this sad case, the allegations suggest that Mayfield's biggest client was part of the swamp Tea Partiers like Mayfield claimed they wanted to drain:

> Unbeknownst to Mark at the time, Trustmark National Bank was solidly in the Cochran camp. Trustmark National Bank was the single largest contributor to a Cochran-related Super PAC, having contributed in excess of $250,000.00 to Mississippi Conservatives, among other contributions. Also unbeknownst to Mark, Trustmark National Bank had financed the million dollar D.C. home of [Cochran aide] Kay Webber, where Thad Cochran also lived. . . . Upon information and belief, when Webber purchased the house, she had a co-signor on the home who was a donor to Cochran and rumored to be the wife of a Member of the Board of Directors for Trustmark National Bank.

Docket No. 6 at 23-24.

On June 27, 2014, Robin Mayfield found her husband in their basement, dead of a gunshot wound to the head. He was 57. The coroner ruled it a suicide.

Robin, her sons, and the Mayfield estate filed this suit three years later. They assert wrongful death, civil conspiracy, negligent infliction of emotional distress, § 1983, and related causes of action against Butler Snow, Clark, the City of Madison, Mayor Hawkins-Butler, Chief Waldrop, Officer Harrison, Officer Currie, and Wilbourn. The plaintiffs claim that the defendants violated rights guaranteed by the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

The plaintiffs have a variety of grievances. They say the Cochran campaign and Butler Snow pressed charges for political advantage so that they could smear the McDaniel campaign for associating with criminals. They say Mayor Hawkins-Butler and members of her City's police department were longtime Cochran supporters who arrested Mayfield in retaliation for his political views. They say the police were wrong to charge Mayfield at all because his speech—disclosing Mrs. Cochran's room number to Wilbourn—was protected by the First Amendment, and that the police further erred by charging him with a felony, since the value of any exploitation did not exceed $250. They say the District Attorney's Office falsely and recklessly blamed Mayfield for giving Kelly the location of Mrs. Cochran's room, when in fact Mayfield told Wilbourn, who *then* told Kelly. They say Butler Snow and the City of Madison were in cahoots because Butler Snow has represented the City in bond issuances and lobbying for years. They express anger and heartbreak at Wilbourn's betrayal of Mayfield, his purported friend, and disbelief that the authorities never charged Wilbourn with conspiracy.

The defendants have all responded with motions to dismiss. They contend that Mayfield's arrest was supported by probable cause, that his claims are untimely, and that his death was his responsibility alone.

## II.    Legal Standards

### A.    Motions to Dismiss

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts the plaintiff's factual allegations as true and makes reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A satisfactory complaint will "contain a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* at 677-78 (quotation marks and citation omitted). This requires "more than an unadorned, the defendant-unlawfully-harmed-me accusation," but the complaint need not have "detailed factual allegations." *Id.* at 678 (quotation marks and citation omitted). The plaintiff's claims must also be plausible on their face, which means there is "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).

### B.    Qualified Immunity

Four defendants have invoked the defense of qualified immunity.

"Qualified immunity shields government officials from civil damages liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 578 (5th Cir. 2009) (quotation marks and citation omitted). "More precisely, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing

6

violates that right . . . in the light of pre-existing law the unlawfulness must be apparent." *Id.* (quotation marks, citation, and brackets omitted).

At the motion to dismiss stage, a qualified immunity analysis requires the Court to decide "(1) whether facts alleged or shown by plaintiff make out the violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct." *Id.* at 579 (citations omitted).

## III.   Discussion

### A.   Butler Snow and Don Clark

In their motion to dismiss, Butler Snow and Don Clark argue that the entirety of the case fails because they had probable cause to report a crime to the Madison Police Department. The plaintiffs agree that their claims, at least as to these defendants, turn on whether there was probable cause.[4]

Probable cause is "a showing of the probability of criminal activity." *United States v. Froman*, 355 F.3d 882, 889 (5th Cir. 2004) (quotation marks and citations omitted). The standard "requires the existence of facts sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed and the person to be arrested (or searched) committed it." *Id.* A proper showing of probable cause requires "more than mere suspicion" but less than "proof beyond a reasonable doubt." *Id.*

The parties further agree that the Court may resolve this motion by considering the incident reports and affidavits referenced in the amended complaint. The Court has reviewed those documents.

---

[4] Per the parties' framework, the Court assumes that Butler Snow and Don Clark are state actors subject to § 1983 liability. The Court does not endorse this dubious assumption. *See Daniel v. Ferguson*, 839 F.2d 1124, 1130 (5th Cir. 1988) ("Police reliance in making an arrest on information given by a private party does not make the private party a state actor.").

The incident reports and affidavits do not show what exactly Don Clark told the Madison Police Department on May 16. A summary of the call was memorialized by someone else, Officer Currie, and three days later at that. The summary said that Clark, representing the Cochran campaign, had called to report a "possible case of exploitation of a vulnerable adult" based on the video Kelly posted on YouTube.

The plaintiffs' amended complaint alleges that Butler Snow and Clark were engaged in "a political prosecution." Their brief adds that the incident report and affidavits "demonstrate . . . that the Butler Snow defendants knew the search and arrest warrants issued for the Rose Cochran Incident lacked probable cause." But the documents show no such thing. They confirm only that Clark reported a "possible" crime against Mrs. Cochran. What else Clark said, suggested, or knew cannot be discerned from the four corners of the document.

On review, the Court finds that Clark's report was supported by probable cause. The YouTube video showed that someone invaded Mrs. Cochran's privacy, took a photo, and broadcast it for political advantage. At a minimum, the perpetrators of such a crime could be subject to prosecution for trespass, breaking and entering, invasion of privacy, and conspiracy to commit those substantive offenses. Clark was well within his rights—anyone would have been— to tell the police that a "possible" crime had been committed.

Nothing suggests that Clark made a false report. Nothing suggests that Clark's report referenced Mayfield. And nothing suggests that Clark or his firm dictated how law enforcement went about its investigation.

To all this, the plaintiffs insist that Clark was in the wrong because no crime was committed. Invasion of privacy requires proof that the victim was "in a state of undress," they say—and Rose Cochran was dressed. But that is a gross misread of the statute. The law required

proof that the victim was in a place where she "*would intend to be*" undressed, "including, but not limited to" a "bedroom." Miss. Code Ann. § 97-29-63(1) (2014) (emphasis added). It is therefore irrelevant that Mrs. Cochran was dressed. She was entitled to privacy in her bedroom.

The plaintiffs then contend that Mayfield had a constitutional right to tell Wilbourn where Mrs. Cochran's room was located. No, he did not. The First Amendment does not guarantee the right to engage in a criminal conspiracy. *See United States v. El-Mezain*, 664 F.3d 467, 537 (5th Cir. 2011) ("It is well established under First Amendment principles that there is no prohibition on the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. In addition, speech itself may be criminal under certain circumstances.").

The plaintiffs next criticize Clark and Butler Snow for failing to report Kelly's trespass to the State Department of Health.[5] The grievance has no merit. The statute they cite says that persons who suspect abuse or exploitation "may" report it to the Department. Miss. Code Ann. § 43-47-37(4). By the terms of this statute, Clark and Butler Snow had no duty to report the exploitation of Mrs. Cochran to the State Department of Health.

The bottom line is that Clark and Butler Snow had probable cause to believe that a crime had been committed. They are not liable for their report to the Madison Police Department.[6]

**B.      Chief Waldrop, Officer Currie, and Officer Harrison[7]**

The law enforcement defendants contend that the plaintiffs' claims are time-barred, that they had probable cause to arrest Mayfield and search his properties, and that they are entitled to qualified immunity.

---

[5] It's an odd complaint: if Clark and Butler Snow really *were* on a witch hunt, would Mayfield truly want them to lodge false complaints with additional government agencies?

[6] Given this outcome, Clark and Butler Snow's motion to file under seal a state-court deposition of Mayor Hawkins-Butler [106] and motion to convert to summary judgment [107] are denied as moot. Their motion for leave to file a supplemental brief [104] is granted; the documents need not be refiled. Their motion for an extension of time to file a reply brief [111] is granted nunc pro tunc.

[7] In this section, the Court will address only the individual-capacity claims brought against these defendants.

9

The amended complaint does not explain how Chief Waldrop violated the plaintiffs' rights, so he is entitled to dismissal. What follows will focus on Officers Currie and Harrison. We pick up where we left off—after Clark's May 16 report to the Madison Police Department.

On May 19, someone at the Madison Police Department completed a supplemental report describing the course of the investigation from May 16 to May 19. It said that a consensual search of Kelly's Facebook account had unearthed messages between Kelly and Mary about their plans to enter Mrs. Cochran's room, take a photo, and use it in a political video. In those messages, Mary told Kelly that "Mark" would arrange for an unknown person to tell Kelly how to locate Mrs. Cochran's room.

The Facebook messages must have led to Mark Mayfield. On May 22, Officer Currie presented to a municipal judge a general affidavit alleging that Mayfield had conspired with Kelly and Mary. It specifically said that "by communicating, planning, and assisting Clayton Kelly with information and resources which aided and assisted Kelly in photographing and filming Rose Cochran inside of her residence, . . . without her knowledge or permission," Mayfield had helped his co-conspirators violate Mississippi Code § 97-29-63. That statute, as it read at that time, provided that:

> Any person who with lewd, licentious or indecent intent secretly photographs, films, videotapes, records or otherwise reproduces the image of another person without the permission of such person when such a person is located in a place where a person would intend to be in a state of undress and have a reasonable expectation of privacy, including, but not limited to, private dwellings or any facility, public or private, used as a restroom, bathroom, shower room, tanning booth, locker room, fitting room, dressing room or bedroom shall be guilty of a felony . . . .

Miss. Code Ann. § 97-29-63(1) (2014).[8]

---

[8] This statute was amended as of July 1, 2015.

Also on May 22, Officer Harrison applied for search warrants for Mayfield's home and business. After describing the course of the investigation, the affidavits explained how, according to Mary, Mayfield agreed to help the conspirators by telling Kelly how to access St. Catherine's Village. The affidavits further stated that Mayfield's home and office would have information (mainly electronically stored information) regarding the exploitation of Mrs. Cochran.

Officer Harrison's affidavits cited a violation of Mississippi Code § 43-47-19(3). Under that statute, "[a]ny person who willfully inflicts physical pain or injury upon a vulnerable person shall be guilty of felonious abuse or battery, or both, of a vulnerable person and, upon conviction thereof, may be punished by imprisonment in the State Penitentiary for not more than twenty (20) years." Miss. Code Ann. § 43-47-19(3).

### 1.    The Constitutional Violations (§ 1983)

The threshold question is whether the plaintiffs' § 1983 claims are timely. The Court concludes that they are. As the Fifth Circuit recently explained in *Winfrey v. Rogers*, when a plaintiff's claim "more closely resembles" a malicious prosecution case than a false imprisonment case, the statute of limitations begins to run when "the prosecution ends in the plaintiff's favor." No. 16-20702, 2018 WL 3976939, at *5 (5th Cir. Aug. 20, 2018). Here, as in *Winfrey*, the plaintiffs' "claim is more like the tort of malicious prosecution, because [the plaintiff] was arrested through the wrongful institution of legal process: an arrest pursuant to a warrant, issued through the normal legal process, that is alleged to contain numerous material omissions and misstatements." *Id.* For this reason, the plaintiffs' § 1983 claims accrued on the date the prosecution ended—which is the date Mayfield died. The plaintiffs' commencement of this lawsuit within three years of that date made it timely. The Court will move on to the merits.

Police officers who apply for warrants are typically entitled to qualified immunity for their on-the-job mistakes. *See Malley v. Briggs*, 475 U.S. 335, 343 (1986). In layman's terms, that means police officers are given "ample room for mistaken judgments."[9] *Id.* Relevant to this case, however, there are "two different situations in which" qualified immunity can be lost and "an officer can be held liable for an unlawful search even when a warrant was obtained." *Melton v. Phillips*, 875 F.3d 256, 266 (5th Cir. 2017) (en banc) (Costa, J., concurring).

The first situation occurs when the attesting officer's "warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Malley*, 475 U.S. at 344-45. "The *Malley* wrong is not the presentment of false evidence, but the obvious failure of accurately presented evidence to support the probable cause required for the issuance of a warrant." *Melton*, 875 F.3d at 266 (Costa, J., concurring).

The second situation comes into play when the attesting officer, or an officer who provides information for the warrant application, makes false statements.

> The Supreme Court held in *Franks v. Delaware* that an officer may be liable when he makes a false statement knowingly and intentionally, or with reckless disregard for the truth that results in a warrant being issued without probable cause . . . . The Fifth Circuit has interpreted *Franks* liability to also include liability for an officer who makes knowing and intentional *omissions* that result in a warrant being issued without probable cause.

*Michalik v. Hermann*, 422 F.3d 252, 258 n.5 (5th Cir. 2005) (quotation marks and citations omitted).

In our case, the most glaring problem is that Officer Currie's affidavit is conclusory. It contains no facts tending to show that Mayfield committed a crime. With the benefit of

---

[9] Despite the existence of qualified immunity, the Supreme Court has found it "desirable" that an officer first pauses to consider "whether he has a reasonable basis for believing that his affidavit establishes probable cause." *Malley*, 475 U.S. at 343. "Premature requests for warrants are at best a waste of judicial resources; at worst, they lead to premature arrests, which may injure the innocent or, by giving the basis for a suppression motion, benefit the guilty." *Id.* at 344-45.

hindsight—*i.e.*, the admissions in the plaintiffs' complaint—we know that she was correct; Mayfield *did* conspire with others to photograph Mrs. Cochran in her bedroom. But Officer Currie's affidavit may run afoul of *Malley* and its progeny because it provides no factual basis on which a judge could evaluate her application.

Officer Harrison's affidavits have the opposite problem. They contain factual matter "sufficient to provide the magistrate with a substantial basis for determining the existence of probable cause" that *a* crime had been committed. *Kohler v. Englade*, 470 F.3d 1104, 1109 (5th Cir. 2006) (quotation marks and citation omitted). But Officer Harrison got the crime wrong. The facts he presented do not lead to the conclusion that Mayfield could have violated Mississippi Code § 43-47-19(3). No one acted or conspired to inflict physical pain upon Mrs. Cochran. Given the criminal statute invoked, it is not obvious whether there was "some nexus between the items to be seized and the criminal activity being investigated." *Id.* (citation omitted).

In short, Officer Currie got the law right but not the facts, while Officer Harrison had the facts correct but not the law. The municipal court judge nevertheless issued all of the arrest and search warrants the officers desired. That issuance does not necessary relieve the officers from liability. Even the Supreme Court has acknowledged that "ours is not an ideal system, and it is possible that a magistrate, working under docket pressures, will fail to perform as a magistrate should." *Malley*, 475 U.S. at 345–46; *see also Kohler*, 470 F.3d at 1109.

The Court requires additional briefing to determine whether the plaintiffs have stated a claim sufficient to overcome Officer Currie and Harrison's qualified immunity defense. Within 30 days, therefore, the Officers may renew their motion to dismiss the § 1983 claims. They shall have a total of 25 pages for their opening and reply briefs. The plaintiffs' response shall be limited to the § 1983 claims against these defendants only. The plaintiff's response shall also be

limited to 25 pages. The parties are encouraged to provide a detailed discussion of the relevant federal case law. Oral argument may be scheduled for later in the fall.

### 2. The State Law Claims

The plaintiffs' state tort claims against Officers Currie and Harrison may not proceed. The plaintiffs missed the one-year filing deadline for intentional torts. *See* Miss. Code Ann. § 15-1-35. Their negligence claims, meanwhile, fail because Mississippi law permits negligence claims arising from suicide only when the decedent was in the custody or control of a facility, such as a mental health facility or hospital. *Truddle v. Baptist Mem'l Hosp.-DeSoto, Inc.*, 150 So. 3d 692, 697–98 (Miss. 2014). That was not the case here.[10] The plaintiffs' effort to distinguish *Truddle* is unavailing; the case they rely upon is grounded in intentional tort, not negligence. *See State for Use & Benefit of Richardson v. Edgeworth*, 214 So. 2d 579, 586 (Miss. 1968).

As a result, these claims are dismissed.

### C. The City of Madison and Mayor Hawkins-Butler

Next up are the plaintiffs' (official-capacity) claims against the City as well as their individual-capacity claims against Mayor Hawkins-Butler. Only the § 1983 claims will be considered further, as the plaintiffs' state-law tort claims fail for the statute of limitations reasons already discussed.

After reviewing the complaint, the Court is unable to see how the City of Madison or its Mayor violated Mayfield's constitutional rights, with one possible exception. Earlier this summer—when the briefing on these motions had already closed—the Supreme Court held that in certain situations, a person who was arrested because of political payback *can* sue a

---

[10] Recognizing this hurdle, the plaintiffs' briefs refuse to concede that Mayfield committed suicide. We are left in a liminal state: the plaintiffs do not admit the suicide, but do not present any alternate theory of death. Whether that is uncertainty or a tactical decision, it cannot save their state-law claims today. Obviously, though, if the plaintiffs discover evidence of murder, the statute of limitations on a resulting civil suit may have been tolled.

municipality for First Amendment retaliation *despite* the existence of probable cause. *Lozman v. City of Riviera Beach, Fla.*, 138 S. Ct. 1945 (2018).

The new decision has obvious resonance to our case. Even if there is probable cause to believe that Mayfield committed a crime, the plaintiffs contend that the City of Madison pursued him in retaliation for his political activities during the 2014 Republican Party primary. The plaintiffs may proceed to litigate this claim, and only this claim, against the City.

Questions remain about whether the plaintiffs can proceed against the Mayor. Mr. Lozman secured the Supreme Court's permission to pursue a *Monell* claim against the City, which cuts against our plaintiffs pursuing the Mayor in her individual capacity. At the same time, however, our plaintiffs' *Lozman* claim appears to be based on a single unconstitutional act of the City's final policymaker—the Mayor. If the claims merge, the plaintiffs may be entitled to proceed against her officially and individually. The Court will then have to address whether she is entitled to qualified immunity because this anti-retaliation principle was (arguably) not clearly established in spring 2014.

Additional briefing would be helpful. Within 30 days, the Mayor may renew her motion to dismiss the *Lozman* claim brought against her in her individual-capacity. The same briefing limits placed on the Officers' motion and response will apply to the Mayor's motion and response.

For these reasons, this motion is granted in part and denied in part.

### D.     Richard Wilbourn, III

The plaintiffs' claims against Wilbourn also cannot proceed. For one, the amended complaint does not contain any allegations describing what Wilbourn did to harm Mayfield or

the plaintiffs. The fact that Wilbourn was listed as a prosecution witness for the Kelly case does not make him part of a conspiracy to violate Mayfield's civil rights or cause emotional distress.

In addition, the only cause of action specifically mentioning Wilbourn, the wrongful death cause of action, says that Wilbourn's "intentional actions" led to Mayfield's suicide. That means the claim is subject to the one-year statute of limitations for intentional torts. *Lee v. Thompson*, 859 So. 2d 981, 991 (Miss. 2003). The plaintiffs missed that deadline and have provided no reason to toll the statute of limitations.

Wilbourn's motion to dismiss is granted in its entirety.

## IV.   Conclusion

Butler Snow and Clark's motion to dismiss is granted. The Officers' motion is granted in part and denied in part without prejudice to refiling as stated above. The City's motion is granted except that the plaintiffs may proceed with their *Lozman* claim. The Mayor's motion is granted in part and denied in part without prejudice to refiling as stated above. Wilbourn's motion to dismiss is granted. Renewed motions to dismiss are due within 30 days.

**SO ORDERED**, this the 18th day of September, 2018.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

16