**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| **ROBIN MAYFIELD; OWEN MAYFIELD; WILLIAM MAYFIELD; THE ESTATE OF MARK STEVENS MAYFIELD** | **PLAINTIFFS** |
| **V.** | **CAUSE NO. 3:17-CV-514-CWR-FKB** |
| **THE CITY OF MADISON, MISSISSIPPI, et al.** | **DEFENDANTS** |

## ORDER

Mark Mayfield was an attorney in Madison County, Mississippi. He practiced real estate law, was active in the Baptist Church, and was a founder of the Mississippi Tea Party.

In 2014, Mayfield supported State Senator Chris McDaniel's effort to unseat U.S. Senator Thad Cochran in the Republican Party primary. Mayfield's actions during that campaign would lead to his tragic and untimely death by suicide. Mayfield's family later commenced litigation against those persons and entities they believed to be responsible for his passing.

The Court initially denied the City of Madison's motion to dismiss. Now, with discovery complete, the City files this motion for summary judgment. It seeks to be released from any liability for Mayfield's death.

For the reasons that follow, the City's motion is granted.

## I.      Factual and Procedural History

The plaintiffs' allegations were discussed in the Court's Order granting in part and denying in part the defendants' motions to dismiss. *See Mayfield v. Butler Snow LLP*, 341 F. Supp. 3d 664 (S.D. Miss. 2018). Three years later, the facts presented below will focus on the evidence relevant to Mayfield and the City of Madison.

It was March 2014. The Republican Party primary was in full swing, and Mark Mayfield was an active supporter of Senator McDaniel. Through his advocacy, Mayfield was drawn into communications with fellow McDaniel supporters John Mary, Richard Sager, and Clayton Kelly, who were pursuing a new way to bolster McDaniel's chances.

Mary, Sager, and Kelly had a plan to claim that Senator Cochran was an adulterer. They wanted to make a video showcasing how Cochran spent time with his longtime aide in Washington, D.C., instead of with his wife, Rose, a resident of the St. Catherine's Village assisted living facility in Madison, Mississippi. Mary and his associates wanted the video to feature a photo of the real Mrs. Cochran.

Mayfield was useful to Mary, Sager, and Kelly because his mother was a resident of St. Catherine's Village. Mayfield knew how to navigate the premises and knew the location of Rose Cochran's room. When contacted about the plan, he wrote Mary to confirm that he could "get someone in the building and is [sic] the room." Mayfield knew, for example, that there was a security camera next to Mrs. Cochran's room.

On March 19, Kelly spoke with someone—he believed it was Mayfield—about accessing St. Catherine's Village. As Kelly recalled the conversation, the person explained how "he went and visited his mother frequently and he passed by Rose Cochran every single day. . . . I remember him telling me he was very sad for her. And I remember him telling me verbatim like I -- like I described earlier how to get there."

On March 30, Kelly got another call with "details on the layout of the place." We do not know who made this call. The Mayfields, however, claim that Kelly spoke with Richard Wilbourn, an attorney in Madison County.[1]

---

[1] Wilbourn was initially a defendant in this case, but the claims against him were dismissed in a prior order.

Kelly went to St. Catherine's Village on Easter Sunday,[2] which that year fell on April 20. He wore his "Easter Sunday outfit" to blend in with the many persons visiting their family members. He then followed the instructions for how to get to Rose Cochran's room. Kelly later explained that "she was displayed with her door open so everyone in the community center could also see." He snapped a photo of a bedridden Mrs. Cochran, then left.

The ensuing YouTube video that Kelly made was, to put it mildly, not a successful piece of political advocacy. McDaniel supporters and Cochran supporters alike thought it an "appalling" portrayal of a bedridden elderly woman.[3] Under pressure, Kelly pulled the video down within hours of its posting.

The Cochran campaign contacted its outside law firm, Butler Snow, to understand its options. The head of the Butler Snow firm then contacted the Mayor of Madison, Mary Hawkins-Butler, to encourage criminal prosecutions of the persons who invaded Mrs. Cochran's privacy. Senator Cochran's campaign manager also contacted the Mayor asking that she turn over the prosecution to Butler Snow. The Mayor directed both of them to the police department.

The police department's top officials met with the head of Butler Snow to hear the allegations. The police department then commenced its investigation. The matter was assigned to Investigators Chuck Harrison and Vickie Currie. Because it was a high-profile case, the City Attorney and local Assistant District Attorneys were brought in regularly to consult on the proper charges. They met daily to discuss what charges to bring and how to proceed.

---

[2] For Christians, we know this to be the holiest day on the calendar. *See, e.g.*, Dr. Martin Luther King, Jr., *Questions That Easter Answers*, April 21, 1957, https://kinginstitute.stanford.edu/king-papers/documents/questions-easter-answers-sermon-delivered-dexter-avenue-baptist-church ("Easter is a day above all days.").

[3] "Appalling" is the word the plaintiffs' brief uses to describe the reaction of McDaniel supporters. Docket No. 408 at 9. Their brief also recounts that one of the purported co-conspirators said the "[v]ideo is horrible, especially with Rose nursing home photos. You're killing her dignity and makes you look [like an] ass." *Id.* at 10.

On May 16, the Madison Police Department arrested Kelly and charged him with exploitation of a vulnerable adult. Kelly gave a voluntary statement and access to his social media accounts. The social media accounts contained messages showing Mary's involvement in the scheme. Additional charges would later be brought against Kelly. He eventually pled guilty to burglary.

On May 20, Madison police arrested Mary. Mary gave a statement explaining Mayfield's role in the events. Mary eventually pled guilty to a conspiracy count.

On May 22, Madison police arrested Mayfield. The basis for Mayfield's arrest warrant was Officer Currie's affidavit stating that Mayfield had assisted the other conspirators in photographing Mrs. Cochran. The police also executed search warrants on Mayfield's home and office. The basis for those warrants was Officer Harrison's affidavits indicating that Mayfield's office would have evidence that he inflicted pain on a vulnerable person.[4] Mayfield's bond was set at $250,000.

Mayfield became depressed, sought professional help, and was prescribed medication for sleep, depression, and anxiety. His wife Robin experienced similar symptoms and was also prescribed medication.

On June 27, 2014, Robin found her husband in their basement. He took his own life. This suit followed.

Claims against Butler Snow and several other defendants have already been resolved. This Order addresses only the Mayfields' claim against the City of Madison: that the Cochran supporters who ran the City arrested Mayfield in retaliation for his involvement with the McDaniel campaign. The Mayfields invoke *Lozman v. City of Riviera Beach*, a Supreme Court

---

[4] Depositions revealed that the defendants lacked any knowledge or belief that anyone in this case inflicted pain upon Rose Cochran.

case holding that in certain circumstances, a person arrested for their political activities can sue a municipality for First Amendment retaliation despite the existence of probable cause for the arrest. 138 S. Ct. 1945 (2018).

The City argues that it cannot be held liable because there is no direct evidence of a "premeditated, official policy to arrest" McDaniel supporters. The Mayfields respond that the evidence shows "a policy-making decision to retaliate against Mark Mayfield for his pro-McDaniel political activities, and to do so in a manner helpful to Thad Cochran's re-election campaign."

Two prior rulings in this case have some bearing on today's Order. First, when read together, this Court's earlier opinion and the Fifth Circuit's opinion in Officer Currie's interlocutory appeal indicate that there was probable cause to arrest Mark Mayfield and search his residence and office. *See Mayfield*, 341 F. Supp. 3d at 670; *Mayfield v. Currie*, 976 F.3d 482, 487 (5th Cir. 2020); *see also United States v. Froman*, 355 F.3d 882, 889 (5th Cir. 2004) (defining probable cause).

Second, the persons who conspired to enter, and then did enter, St. Catherine's Village to photograph Rose Cochran were not engaging in First Amendment-protected activity. "The First Amendment does not guarantee the right to engage in a criminal conspiracy," this Court previously reasoned. *Mayfield*, 341 F. Supp. 3d at 670 (citing *United States v. El-Mezain*, 664 F.3d 467, 537 (5th Cir. 2011)).

With those principles in mind, we turn to the legal standard.

## II.    Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A party seeking to avoid summary judgment must identify admissible evidence in the record showing a fact dispute. *Id.* at 56(c)(1). "Once a summary judgment motion is made and properly supported, the nonmovant must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial. Neither 'conclusory allegations' nor 'unsubstantiated assertions' will satisfy the nonmovant's burden." *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (quotation marks and citations omitted).

The Court views the evidence and draws reasonable inferences in the light most favorable to the nonmovant. *Maddox v. Townsend and Sons, Inc.*, 639 F.3d 214, 216 (5th Cir. 2011). But the Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *McCallum Highlands, Ltd. v. Wash. Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as revised on denial of reh'g*, 70 F.3d 26 (5th Cir. 1995).

## III.   Discussion

### A.   The Statute of Limitations

In its earlier opinion, this Court held that this matter most closely resembled a malicious prosecution case, rather than a false imprisonment case. *Mayfield*, 341 F. Supp. 3d at 672. Accordingly, the three-year statute of limitations began to run on the date that the prosecution ended. The suit was timely.

The conclusion still rings true as to the case as a whole. But it is perhaps difficult to reconcile that reasoning with the fact that *right now*, the sole claim before the Court is one of retaliatory arrest, not retaliatory prosecution. And if the three-year statute of limitations for this cause of action began to run on the date of Mark Mayfield's retaliatory arrest, then the City of Madison has a strong argument that, at least as to this claim, the Mayfields' assertion of their rights was untimely.

The issue is arguably moot because the Court has found in the City's favor on the merits, *see infra*, but the Court mentions it here because of the likelihood that the Fifth Circuit will hear the case next, and may wish to clarify the proper accrual of a *Lozman* claim.

## B.     Retaliatory Arrest

For many years, the law was clear that governments could retaliate against persons who expressed irksome ideas and opinions—gadflies and the like—by arresting them, as long as law enforcement officers had probable cause to arrest. *E.g.*, *McLin v. Ard*, 866 F.3d 682, 694 (5th Cir. 2017). *Lozman* changed that. It represents a new way to seek First Amendment protection.

The case arose out of Fane Lozman's "contentious relationship" with the City of Riviera Beach. 138 S. Ct. at 1949. As the Court explained,

> Soon after his arrival Lozman became an outspoken critic of the City's plan to use its eminent domain power to seize homes along the waterfront for private development. Lozman often spoke during the public-comment period at city council meetings and criticized councilmembers, the mayor, and other public employees. He also filed a lawsuit alleging that the Council's approval of an agreement with developers violated Florida's open-meetings laws.

*Id.*

The City Councilmembers were unhappy with Lozman's criticism. During one closed-door meeting, a Councilmember said the City should "intimidate" him. *Id.* Others agreed. *Id.* And five months later, the City acted on that threat. While he was (again) making public comments at a City Council meeting, a Councilmember ordered a municipal officer to arrest Lozman. *Id.* at 1950. He was charged with disorderly conduct. *Id.* The State later dismissed the charges. *Id.*

The Supreme Court agreed that these facts set forth a plausible claim of First Amendment retaliation. "An official retaliatory policy is a particularly troubling and potent form of

retaliation," it reasoned, "for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer." *Id.* at 1954. It added,

> This unique class of retaliatory arrest claims . . . will require objective evidence of a policy motivated by retaliation to survive summary judgment. Lozman, for instance, cites a transcript of a closed-door city council meeting and a video recording of his arrest. There is thus little risk of a flood of retaliatory arrest suits against high-level policymakers.

*Id.* The Court then remanded the matter for further proceedings.

In this case, the Mayfields' best evidence of wrongdoing comes from the deposition testimony of former Madison County ADA Dow Yoder. He said that after the arrests, Mayor Hawkins-Butler told him, "[i]f the DA's office is scared to -- going to be scared to prosecute these McDaniel supporters, I've got Butler Snow and Andy Taggart, they are just drooling, ready to get started prosecuting. If y'all can't do your job, we'll be glad to get Butler Snow . . . ."

Yoder claimed that Officer Currie told him similar things, including "[a]re you going to play ball and do what's expected or are you going to let somebody else carry the water?" (It should be noted here that Yoder was known to be a McDaniel supporter, so "are you going to play ball" could have multiple meanings.) At one point Officer Currie told Yoder, "[w]e've just got to figure out what to charge them with."

Yoder then testified about what was happening within the District Attorney's Office. He said that District Attorney Michael Guest—now a member of Congress—"admitted" that "there would not have been probable cause to arrest Clayton Kelly." The ADAs were openly discussing that they could not prove all of the elements of the crimes, especially the intent element, Yoder recalled. On the day Mark Mayfield died, Guest apparently told Yoder:

> Dow, you know, we were just trying to get these folks in the pretrial diversion or just get them to admit that there was something morally or, you know, something -- you know, we're not trying to put any of these guys in jail, you know. Maybe

> Clayton Kelly, we'll see about him, but, you know, we've got to get there. And you can't get there unless you've got people who were cooperating.

Yoder was so concerned that he called the FBI. He was later terminated from the DA's Office.

The legal standard requires the Court to view this evidence in the light most favorable to the Mayfields. It suggests that the City of Madison and the District Attorney's Office were aggressively pursuing those persons they felt had committed voyeurism or trespassed into Rose Cochran's room at St. Catherine's Village. Those persons were McDaniel supporters.

What the evidence does not show, however, is that any investigation, arrest, search, or prosecution was carried out *because of political beliefs*. That a handful of McDaniel supporters conspired to enter, and in one case did enter, St. Catherine's Village is undisputed. But there is no evidence that they were targeted for prosecution because they were McDaniel supporters. In *Lozman* terms, the Mayfields have no evidence that the City made an official plan to retaliate against McDaniel supporters on the basis of their First Amendment-protected activity.

This is where the law turns interesting.

First, *Lozman* may be incomplete. In a case handed-down one year later, the Supreme Court considered a retaliatory arrest claim brought against individual officers, rather than a municipality. It held that one relevant factor in these claims is whether "a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019). That seems a valuable addition to the law. Mr. Lozman's case gets stronger if he can point to other people who weren't arrested for similar conduct.

Second, *Lozman* is a "unique" case because the facts are (a) known and (b) so plainly objectionable. 138 S. Ct. at 1954. The opinion explicitly noted that the presence of "a transcript of a closed-door city council meeting and a video recording of [plaintiff's] arrest" were rare. *Id.*

9

This Court agrees. It is unusual for a defendant to place this kind of direct evidence of unlawful intent into a written, contemporaneous record. Most parties are more sophisticated than the City of Riviera Beach.

The question then becomes, what is to be done about indirect, circumstantial situations of First Amendment retaliation? The Supreme Court persuasively explained why judicial remedies must be available, reasoning that "when retaliation against protected speech is elevated to the level of official policy, there is a compelling need for adequate avenues of redress." *Id.* But the remedy *Lozman* offers is limited to only the most blatant examples of municipal retaliation. In addition, with probable cause no longer serving as a clear gatekeeper to these claims, it will be difficult to discern exactly when to allow a *Lozman* claim proceed into discovery or trial.

After living with this case for some time, the Court has wondered whether a more familiar burden-shifting framework could be used. Just as in employment discrimination cases, in these situations we are trying to look past a given reason for an adverse event—look beyond a firing for poor performance, or an arrest for something as broad as "disorderly conduct"—and determine if the given reason is a mere pretext for unlawful activity. In other words, courts are trying to use the burden-shifting framework to get at the truth of a given situation.

Adopting another judicial framework is not a perfect solution. In their book *Unequal*, Sandra F. Sperino and Suja A. Thomas observe that the *McDonnell Douglas* test is "quite complex." SPERINO AND THOMAS, UNEQUAL 115 (2017). They also argue that the framework itself "can distract judges from the main question of whether a person was treated differently because of a trait, such as sex or age." *Id.* at 119. On the other hand, it at least is a familiar starting point. How many *Lozman* claims will the judiciary unknowingly turn a blind eye toward,

simply because there is no transcript showing an official policy of premeditated retaliation? If a framework can provide some direction toward truth, then it is worth considering.

In what follows, then, the Court will consider whether the indirect evidence of First Amendment retaliation can support the Mayfields' claim beyond the summary judgment stage.

To make out a prima facie *Lozman* claim, at the summary judgment stage the plaintiff must put forward evidence that he was (a) arrested by municipal officers, after (b) engaging in First Amendment-protected activity, for which (c) the charges were later dismissed. The municipality must then come forward with its legitimate, non-discriminatory reasons for the arrest. *See, e.g.*, *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 474 (5th Cir. 2015). Finally, the plaintiff "must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for" First Amendment retaliation. *Id.* (quotation marks and citation omitted). "A plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 378–79 (5th Cir. 2010) (quotation marks and citation omitted).

Applied here, for present purposes the Mayfields have stated a prima facie case, as they claim that the retaliatory arrest was for Mark Mayfield's protected speech in being a vocal McDaniel supporter.[5] Because the prima facie test is not supposed to be overly burdensome, that is enough.

The City, in turn, has articulated a legitimate, non-retaliatory reason for Mayfield's arrest. Based on the evidence gathered during its investigation, the City had probable cause that Mayfield conspired with others to trespass onto St. Catherine's Village property.

---

[5] The City "does not dispute that Plaintiffs have evidence of Mayfield's exercise of his First Amendment rights." Docket No. 401 at 16.

At the third and final step, the Mayfields must come forward with evidence that a jury could use to conclude that the City's probable cause was, for lack of a better term, bullshit. *See generally* HARRY G. FRANKFURT, ON BULLSHIT (2005) (attempting to define the term). The questions at step three are supposed to be tailored to the particular circumstances of the case. In age discrimination cases, for example, "[a] plaintiff can show pretext and discriminatory motive by pointing to age-related comments made by a person in charge of firing"; "by pointing out that the employer replaced the plaintiff with a younger, 'clearly less qualified' employee"; or "by showing a departure from standard procedure." *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 457, 459 (5th Cir. 2019) (citations omitted).

In this case, the framework suggests that we should ask a series of questions. Did the investigation follow the evidence to its targets, or did the police "round up the usual suspects?" Was there anything unusual about the timing or the manner of the City's investigation? Is there any other case where the City Attorney met with the District Attorney and the investigators every day to discuss charges and be involved in how those charges would proceed? Were persons who engaged in similar conduct also arrested, or were they let off the hook because of more agreeable political beliefs? *See Nieves*, 139 S. Ct. at 1727.

An examination of the evidence adduced in this case satisfactorily answers these questions. Instead of rounding up the most vocal McDaniel supporters, City investigators followed the evidence from Kelly to Mary to Mayfield. The police were given free rein to conduct their investigation as they saw fit, without direction from the Mayor, a Cochran supporter. There is no evidence that before the Rose Cochran incident, the City of Madison was itching for an excuse to go after McDaniel supporters. And there is no evidence of differential treatment of McDaniel and Cochran supporters. As an example, there is no evidence that

Cochran supporters entered a McDaniel relative's home in Madison, after which the City refused to prosecute them.

To this, the Mayfields would no doubt press the testimony of Yoder. Perhaps of most concern is Yoder's testimony that "this case was handled unlike any other case that ever came through the DA's office." The problem with this evidence, though, is that the City of Madison is not responsible for the prosecutorial decisions of the District Attorney's Office. One is a municipal entity; the other is a State entity. Evidence of an unusual process from the State actors is not evidence of a pretextual arrest by the City officers.

The Mayfields have also pressed that, in their minds, the City brought a series of cases against McDaniel supporters that lacked probable cause. Those arguments, however, are generally foreclosed by the guilty pleas of two of the conspirators, as well as the fact that it is the law of the case that the City had probable cause to arrest Mayfield.

For these reasons, the Court grants the City's motion for summary judgment on the merits of the Mayfields' *Lozman* claim.

### C. Damages

Finally, the City argues that the Mayfields are not entitled to wrongful death damages because they have no evidence or expert that Mark Mayfield was under an irresistible impulse.

In suicide cases, Mississippi law permits recovery "only if the suicide was proximately caused by the intentional act of the defendant, creating an irresistible impulse in the decedent to take his or her own life." *Truddle v. Baptist Mem'l Hosp.-DeSoto, Inc.*, 150 So. 3d 692, 695 (Miss. 2014) (citations omitted). A colleague on this Court has interpreted that to require evidence "that the decedent must have been in a state of mental disturbance"; "must not be in control of his faculties"; must act "without conscious volition"; and "the impulse must in fact be

proximately caused by the wrongful conduct of the defendant." *Shamburger v. Grand Casino of Mississippi, Inc./Biloxi*, 84 F. Supp. 2d 794, 799 (S.D. Miss. 1998) (quotation marks omitted).

Here, the Mayfields have no evidence, expert or otherwise, that Mark Mayfield acted under an irresistible impulse. The motion on this issue of wrongful death damages is therefore granted.

## IV.   Conclusion

The City's motion for summary judgment is granted.

**SO ORDERED**, this the 19th day of May, 2021.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE